IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRAD LIEBERMAN (#837914),        )
                                 )
            Plaintiff,           )
                                 )   No. 03 C 2009
      v.                         )
                                 )   Judge Mark Filip
                                 )
TIMOTHY BUDZ, et al.,            )
                                 )
            Defendants.          )

## MEMORANDUM OPINION AND ORDER

Plaintiff Brad Lieberman is a civil detainee in the custody of the Illinois Department of Human Services. At the time he initiated this action, Plaintiff was facing commitment under the Illinois Sexually Violent Persons Commitment Act, 725 ILCS § 7/1, *et seq.*; he has since been formally committed following, *inter alia*, a jury trial at which he was found to pose a sufficient continuing threat to society to warrant civil commitment as a sexual predator. *See generally Kansas v. Hendricks*, 521 U.S. 346 (1997) (upholding the constitutionality of such civil commitment regimes where preconditions are met). Plaintiff has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 concerning alleged mistreatment and inadequate conditions of confinement at the Joliet Treatment and Detention Facility. This matter is before the Court for consideration of certain Defendants' motions to dismiss the complaint for failure to state a claim. For the reasons stated in this order, the motions are granted in part and denied in part.

## I.    INTRODUCTION

By way of introduction, the *pro se* plaintiff in this case, Mr. Bradley Lieberman (also, "Plaintiff") has intermittently been a figure of some notoriety on the legal landscape in Chicagoland for almost thirty years now. In 1979 and 1980, Mr. Lieberman committed a highly-

publicized series of violent rapes over several months in Cook and Lake Counties—in the communities of Skokie and Highland Park, Illinois, as well as on the north side of Chicago. *See generally, e.g., The People of the State of Illinois v. Lieberman*, 542 N.E.2d 894 (Ill. App. Ct. 1989). The rapes became particularly notorious, at least in part, because of the manner in which Mr. Lieberman committed the crimes. *See, e.g., id.*, at 897. Mr. Lieberman, a young man from an affluent Chicago suburb, would devise relatively sophisticated ruses to gain entry to the homes of his victims. *See, e.g., People of the State of Illinois v. Lieberman*, 438 N.E.2d 516, 518 (Ill. App. Ct. 1982). Oftentimes, these ruses involved Mr. Lieberman posing as a plumber or as a law enforcement officer, the latter of which involved his use of various "police" badges confiscated from him at the time of his initial arrest. *See, e.g., id.* at 518-19. The *modus operandi* for these crimes was strikingly similar—after gaining entry by posing as a plumber (or off-duty police officer who was working part-time as a plumber), Mr. Lieberman would take his victim on a tour of her apartment or home looking for an alleged "leak" that had been reported. *See, e.g., Lieberman v. Washington*, 128 F.3d 1085, 1090-91 (7th Cir. 1997). (Presumably this allowed Mr. Lieberman to verify that the woman-victim was alone.) Mr. Lieberman then would inform the victim that the leaking pipe appeared to be in or behind a bedroom closet, and he would request his victim to remove her belongings from the closet. *See, e.g., id.* at 1090. In each case, while the women were emptying their closets, Mr. Lieberman would grab his victim around her neck from behind. *See, e.g., id.* As one victim described, after grabbing her from behind, Mr. Lieberman "held a knife to her throat, and told her that if she struggled he would kill her. He added that he had previously 'cut up' another girl and that she should just close her eyes, take her clothes off, and relax." *Id.; see also, e.g., Lieberman*, 438 N.E.2d at 518 (chronicling how Plaintiff would

2

"occasionally threaten[] to kill" one victim with the knife while raping her "if she did not obey").
The last of these violent rapes—of a foreign exchange student who was residing in Highland Park,
Illinois, whom Mr. Lieberman bound with an electrical cord—occurred after Mr. Lieberman's
parents had secured bond for him on the series of Cook County/Skokie rape charges. *See, e.g.,*
*Lieberman,* 128 F.3d at 1088. Mr. Lieberman was apprehended after the Highland Park rape
when two schoolboys, Matthew Adler and David Schaefer, noted Mr. Lieberman leaving the
home where he committed the rape and wrote down the license plate number and make of the car
he was driving, a brown Camaro. *See, e.g., id.* at 1088-89. Mr. Lieberman, always correctly
described by his victims as a large, hulking, muscle-bound man, was arrested later that day in the
brown Camaro with the license plate that the boys had transcribed. *See, e.g., id.* at 1088.

Mr. Lieberman was convicted by juries in both Lake and Cook Counties. He steadfastly
denied any involvement in the rapes. The evidence against him, as repeatedly noted by reviewing
courts, was overwhelming. *See, e.g., Lieberman,* 128 F.3d at 1093 (discussing the "wealth of
evidence of Lieberman's guilt"); *id.* (discussing the "overwhelming evidence of Lieberman's guilt
presented during the Lake County trial"); *id.* at 1095 (discussing the "abundance of evidence
proffered at trial" concerning the Cook County rape convictions); *id.* at 1096 (discussing the
"overwhelming evidence of Lieberman's guilt in the Cook County" prosecution) (internal
quotation marks omitted).

At trial, the evidence against Mr. Lieberman included extensive eyewitness testimony,
often from victims who observed him at immediate range for as much as a half-hour, and who
typically identified him in photospreads and again at line-ups; the striking similarity of the *modus
operandi* used to commit the crimes; corroborating physical evidence in the form of, for example,

3

recovered items such as the knife and badges variously used in the rapes; and the matched automobile type and license plate number that led to Mr. Lieberman's final apprehension following the Highland Park rape while Mr. Lieberman was on bond for the Cook County rapes. *See, e.g., Lieberman*, 128 F.3d at 1088-90; *Lieberman*, 438 N.E.2d at 520. Mr. Lieberman also offered various alibis to the crimes which were affirmatively disproved by third-party witnesses. For example, Mr. Lieberman testified that he was at an automobile repair shop at the time of the Lake County rape; however, repairmen from that shop testified to the falsity of the alibi and explained that Mr. Lieberman's mother had repeatedly asked them to provide inaccurate documentation that would support the eventual alibi attempt. *See Lieberman*, 128 F.3d at 1089; *id.* at 1093. By way of another example, Mr. Lieberman offered an alibi to another rape predicated on his purported presence at the relevant time at his job at the Lutheran General Hospital in Park Ridge, Illinois; at trial, the State introduced evidence showing that Mr. Lieberman, in fact, was not working at the time, to which Mr. Lieberman responded that he "apparently" had not been working on the day in question. *See Lieberman*, 438 N.E.2d at 520. Mr. Lieberman was convicted by two juries and variously sentenced to forty years imprisonment, with some concurrent sentences within that forty-year span. *See, e.g., People of the State of Illinois v. Lieberman*, 772 N.E.2d 876 (Ill. App. Ct. 2002) (discussing sentences).

While incarcerated, Mr. Lieberman was then the subject of columns written by Mike Royko, a widely-read, Pulitzer-Prize winning columnist who variously wrote for decades in the Chicago Daily News, the Chicago Sun Times, and the Chicago Tribune. At least some of these columns are collected at the website of "The Awareness Center," which explains that is a Jewish Coalition Against Sexual Abuse/Assault. *See* http://www.theawarenesscenter.org (under tab for

"Sexual Assault in Jewish Communities (Rape)," "The Case of Brad Lieberman"). In these columns, Mr. Royko critically addressed complaints Mr. Lieberman had been expressing about his life in jail—which Mr. Royko explained had been relayed by a state legislator whom Mr. Lieberman had sought to use to improve his situation—as against the statements about the rapes from Mr. Lieberman's victims.

Mr. Lieberman reappeared prominently on the Chicago legal landscape in the year 2000. At that time, after serving somewhat less than half of his criminal sentence, he was set to be released. *See In re Detention of Brad Lieberman*, 776 N.E.2d 218, 221 (Ill. 2002). The State of Illinois designated him for consideration for continuing civil detention pursuant to the Illinois Sexually Violent Persons Act, 725 ILCS 207/1 *et seq.* (also "SVPA"). *See id.*, 776 N.E.2d at 221. Mr. Lieberman argued that an alleged technicality in the legislation, caused by an oversight of the Illinois General Assembly, precluded consideration of people like him, who had been convicted of "rape," for designation under the Sexually Violent Persons Act. *Id.* at 222. The trial judge, then-Cook County Circuit Court Judge (and present Illinois Supreme Court Justice) Thomas R. Fitzgerald, rejected that contention. *See id.* at 222. The Illinois Court of Appeals, however, found in Mr. Lieberman's favor—holding that the failure to specifically mention "rape" as a sexually violent crime was a legislative "oversight" that precluded consideration of Mr. Lieberman for designation as a "Sexually Violent Person." *See In re Detention of Brad Lieberman*, 745 N.E.2d 699, 708 (Ill. Ct. App. 2001). That decision was reversed by a Illinois Supreme Court, however, with Justice Mary Ann McMorrow writing for a unanimous court. *See In re Detention of Brad Lieberman*, 776 N.E.2d at 228 (holding that "a conviction for the crime of rape constitutes a 'sexually violent offense' under the applicable version of the [Illinois SVPA]"). In 2006, a Cook

County jury found that Mr. Lieberman (who had been detained throughout pending trial) warranted civil commitment under the SVPA.

Mr. Lieberman presently has filed numerous *pro se* law suits. (According to the Clerk's Office, he has filed about twenty). This is one of those suits. Defendants have made limited motions to dismiss, and for the most part have not addressed arguments (concerning claim-splitting or the first-filed rule, for example) that might bear on the propriety of the multiplicity of filed suits, as those arguments often are resolved at the summary judgment stage.

Accordingly, the Court turns to the motions to dismiss in the pending case. As explained, the motions are granted in part and denied in part.

## II.    STANDARD OF REVIEW

Precedent teaches that *pro se* complaints are to be generously construed. *See McCormick v. City of Chicago*, 230 F.3d 319, 325 (7th Cir. 2000) (collecting cases). They should be dismissed for failure to state a claim only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See id.* Fact pleading is not necessary to state a claim for relief. *See Thompson v. Washington*, 362 F.3d 969, 970-71 (7th Cir. 2004).

When considering whether to dismiss a complaint for failure to state a claim upon which relief can be granted, the Court takes the allegations in the complaint as true, viewing all facts, as well as any inferences reasonably drawn therefrom, in the light most favorable to Plaintiff. *See Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits of the

factual allegations. *See, e.g.*, *Weiler v. Household Finance Corp.*, 101 F.3d 519, 524 n.1 (7th Cir. 1996) (citations omitted).

## III.   FACTUAL CONTENTIONS

The Court takes the following factual contentions from the operative complaint. The Court takes no position, of course, on whether the allegations are in fact true or not.

Plaintiff is a civil detainee, committed as a "sexually violent person" pursuant to 725 ILCS § 207/5 *et seq*, which is more commonly known as the Illinois Sexually Violent Persons Act. (See Liberty Defendants' Exhibit A, Commitment Order dated April 26, 2006.) Under that statute, a sexually violent person is someone who has been convicted of a sexually violent offense and who is proven and found to be "dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence" again. 725 ILCS 207/5(f). Plaintiff previously was held at the Joliet Treatment and Detention Facility (also, "TDF") from September 2000 until the summer of 2006, when he was transferred along with all other SVPA detainees to the new facility in Rushville, Illinois. (D.E. 53.)

In this case, Plaintiff sues fifteen employees and contractors of the Illinois Department of Human Services (also, "DHS"). Defendants include: (1) Joliet TDF Director Timothy Budz; (2) Bureau Chief Thomas Monahan; (3) Secretary Linda Baker; (4) Security Guard James Kitanski; (5) Security Supervisor Sy Hopson; (6) Security Director Robert Glotz; (7) Therapist David Kregel; (8) Therapist Shan Jumper; (9) Security Supervisor Shane Tooley; (10) Security Supervisory Douglas Collins; (11) Administrative Assistant and Grievance Officer Fran Aden;

(12) Therapist Travis Heinze; (13) Clinical Director Raymond Woods; (14) Security Guard G.C. Henderson; and (15) Liberty Behavioral Health Company.[1] (D.E. 1.)

By Minute Order of October 30, 2003, Judge Leinenweber, who was then presiding in this case, dismissed certain claims—mostly concerning alleged official misconduct or misuse of public funds and challenges to the constitutionality of the Sexually Violent Persons Act. Plaintiff alleges the following, remaining facts, which must be accepted as true for purposes of Defendants' motions.

Preamble to Counts One through Five: The Joliet TDF was located within the confines of the old Joliet Correctional Center. (D.E. 1 ¶ 2.) Plaintiff was under the constant watch of uniformed officers and surveillance cameras. (*Id.* ¶ 5.) Disciplinary rules for sexually violent persons were identical to the disciplinary procedures for convicted prisoners. (*Id.* ¶ 6.) Detainees were "written up" for the rule infractions and, when facing discipline, Plaintiff was not afforded advance notice of the charges. (*Id.* ¶ 9.) In many cases, the charged rule violations allegedly were "contrived, fabricated and falsified." (*Id.*) The Behavior Committee that adjudicated the disciplinary reports supposedly had no interest in fact-finding; rather, the Committee's goal was to punish detainees and to create a record justifying their continued confinement. (*Id.* ¶¶ 9, 11.) Whenever Plaintiff was in segregation status, he was required to wear a jumpsuit and handcuffs when leaving the segregation unit. (*Id.* ¶ 11.)

---

[1] Defense counsel has entered an appearance for Carol Adams. However, Carol Adams does not appear to be a proper Defendant in this case; she is not named in the Complaint.

Grievances were routinely disregarded without any substantive review. (*Id.* ¶ 10.) In addition, Defendants Budz, Monahan, Glotz, Kegel, Heinze, Jumper, and Woods frequently retaliated against Plaintiff for his grievances and lawsuits. (*Id.* ¶ 13.)

The water at the Joliet TDF was polluted with radon, radium, and other contaminants. (*Id.* ¶ 15.)

It was the policy of the DHS and Liberty Healthcare to treat detainees who signed a form consenting to treatment better than those who refused to sign the consent form. (*Id.* ¶ 17.) Plaintiff maintains that he would not sign the consent form because he was unwilling to concede that he is a sexually violent person. (*Id.* ¶ 14.) (To this day, despite the overwhelming evidence of his guilt, Mr. Lieberman seemingly denies having ever committed any sexual crimes.) As a result of refusing to sign the form, Plaintiff was subjected to conditions he characterizes as "punishment." (*Id.* ¶ 9.) Pretrial detainees were housed with persons already adjudicated as sexually violent. (*Id.* ¶ 18.)

Incoming and outgoing mail, both legal and personal, supposedly was often suspiciously "lost." (*Id.* ¶ 13.)

In Count One, Plaintiff charges that he asked certain staff members to testify on his behalf regarding his day-to-day conduct, attitude, and demeanor. (*Id.* ¶ 21.) One officer, Defendant Kitanski, indicated that he preferred not to be called. (*Id.*) Plaintiff did not pester Kitanski; he simply thanked him and walked away. (*Id.*) However, the following day, Plaintiff supposedly was called to appear before the "Behavior Committee" without any advance notice. (*Id.*) Defendants Heinze, Kegel and Tooley, committee members, refused to allow Plaintiff to read Kitanski's false disciplinary report or to call witnesses and found him guilty even though they had

not yet even decided on a charge. (*Id.* ¶¶ 22-23.) Plaintiff contends that he was ultimately punished for the offense of giving false information to an employee. (*Id.* ¶¶ 23-24.)

Two days later, Kitanski filed another false disciplinary report. (*Id.* ¶ 32.) The same Behavior Committee members once again denied Plaintiff due process in the ensuing disciplinary proceedings. (*Id.* ¶ 33.) He was found guilty and certain privileges were suspended. (*Id.* ¶ 33.) The disciplinary reports were supposedly cited as one basis for finding Plaintiff deserving of civil commitment under the SVPA. (*Id.* ¶ 38.)

Plaintiff filed grievances challenging the disciplinary action. (*Id.* ¶ 34.) Defendants Baker, Budz, Glotz, Woods and Hopson denied the grievances, ignoring certain evidence and violating the Administrative Code's time frame. (*Id.* ¶¶ 34-36.)

Defendant Kegel was unlicensed and unqualified to act as Plaintiff's primary therapist; he was terminated when it was discovered that he was practicing without a license. (*Id.* ¶ 39.) Plaintiff contends that any decisions made by Kegel concerning Plaintiff should therefore be rendered "null and void." (*Id.*)

In Count Two, Plaintiff contends that the manner in which visitation was conducted at the Joliet TDF was more punitive and restrictive than at a maximum security prison. (*Id.* ¶ 42.) The facility put cumbersome procedures in place concerning advance registration. (*Id.* ¶¶ 43-44.) Plaintiff was forced to submit to a strip search before and after visits. (*Id.* ¶ 45.) Security cameras monitored all visits visually and audially. (*Id.* ¶ 47.) Security officers often stationed themselves a few feet away from Plaintiff and his visitors, disrupting the visit and ordering searches of Plaintiff's visitors after they used the washroom. (*Id.*)

In May of 2002, Plaintiff filed a supplemental complaint in one of his cases alleging a long-term pattern of harassment on the part of Defendant Collins. *See Lieberman v. Budz*, No. 00 C 5662 (N.D. Ill.), D.E. 34. Although the Court (Leinenweber, J.) directed that Plaintiff file a separate lawsuit, *Id.*, D.E. 44, Collins was served with the pleading.

On December 21, 2002, Collins ordered Plaintiff to use the washroom in his housing unit rather than the visiting room bathroom during a visit. (D.E. 1 ¶ 52.) Plaintiff protested but followed Collins's orders. (*Id.*) When Plaintiff returned to the visiting room, another staff member confirmed that Plaintiff did not have to leave the visiting room and use his own bathroom. (*Id.*) That night, on Collins's orders, security aides Butler, Olson, Tolbert and Pickett searched Plaintiff's cell for two and a half hours, leaving the room in complete disarray. (*Id.*) Collins allegedly continued to harass Plaintiff's visitors afterwards. (*Id.* ¶ 53.)

On January 11, 2003, Plaintiff approached the control room where Collins was situated and asked to speak to him about the perceived harassment. (*Id.* ¶ 55.) Collins yelled, "I don't know what you're talking about" and shut the chuck hole door in Plaintiff's face. (*Id.*) Plaintiff later received a disciplinary report charging him with intimidation and threats although he had not threatened or intimidated Collins. (*Id.* ¶ 56.)

On January 16, 2003, Defendant Jumper and other John Doe members of the Behavior Committee conducted a hearing. (*Id.* ¶ 60.) They informed Plaintiff of a second write-up for additional threatening or intimidating comments Plaintiff had allegedly made to Collins and found him guilty of the offenses, despite exonerating evidence which allegedly should have been believed. (*Id.* ¶¶ 60-62.)

Defendant Henderson has likewise allegedly filed unwarranted disciplinary reports. (*Id.* ¶ 69.) Plaintiff specifically challenges a disciplinary report dated February 8, 2003, for an unspecified rule infraction after Plaintiff's visitor kissed his hand. (*Id.* ¶¶ 69-70.) Defendants Aden and Budz denied Plaintiff's subsequent grievance. (*Id.* ¶ 73-74.)

In Count Three, Plaintiff alleges that Defendants Budz, Liberty Healthcare Company, Glotz, Monahan, Baker, Woods, Kegel and others retaliated against Plaintiff for his multiple lawsuits. (*Id.* ¶ 84.)

In November 2001, Defendant Glotz refused to accept the delivery of dietary supplements that had been ordered for Plaintiff. (*Id.* ¶ 85.) The next month, Plaintiff received a written recommendation from his endocrinologist recommending or at least permitting the protein supplements, but TDF officials remained steadfast in their refusal. (*Id.* ¶¶ 86-88.) One of Plaintiff's attorneys contacted DHS counsel. (*Id.* ¶ 88.) Immediately thereafter, in direct retaliation for Plaintiff's efforts, he was called before a behavior committee for giving false information to an employee in connection with the doctor's orders. (*Id.* ¶ 89.) Plaintiff received no advance notice of the charges. (*Id.* ¶ 91.) Defendant Kegel berated Plaintiff for contacting DHS counsel. (*Id.* ¶ 90.) Plaintiff was found guilty of misrepresenting the doctor's recommendation as a doctor's order and he was placed in segregation. (*Id.* ¶¶ 92-93.) In reality, Plaintiff contends, Defendants were angry because Plaintiff had gone over their heads. (*Id.* ¶ 95.) While in segregation, Plaintiff could not exercise and was denied all personal property. (*Id.* ¶¶ 96-97.)

In Count Four, Plaintiff asserts that Kegel intentionally lodged false information in Plaintiff's medical file to justify his commitment under the Sexually Violent Persons Act. (*Id.* ¶¶

103, 106.) The other Defendants supposedly made no efforts to rectify Kegel's alleged errors after he was discharged from the facility. (*Id.* ¶¶ 108-11.)

As noted *supra*, Count Five, to the extent it challenged the constitutionality of the Sexually Violent Persons Act both on its face and as applied to Plaintiff, was dismissed by Minute Order of October 30, 2003. (D.E. 9.) In that count, Plaintiff also complains of nutritionally inadequate and bad-tasting food, problems with his mail, cell searches, and excessive noise. (D.E. 1 ¶¶ 114-18.)

## IV.    ANALYSIS

### A.    General Alleged Pleading Deficiencies

Defendants have filed a motion to dismiss the complaint for failure to comply with Fed. R. Civ. P. 8(e)(1), which requires that pleadings be "simple, concise, and direct," as well as Fed. R. Civ. P. 10(b), which requires that each claim be stated in separate, numbered paragraphs.

As noted above, the Court must construe *pro se* complaints generously. "Usually . . . [plaintiffs] need do no more than narrate a grievance simply and directly, so that Defendant knows what he has been accused of." *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005). The Complaint in this case satisfies this low standard: although the Complaint is meandering and unorganized, Plaintiff's basic claims are not difficult to ascertain. These arguments do not justify dismissal of the Complaint.

### B.    Failure to State a Claim

Defendants have moved to dismiss the complaint for failure to state a claim. Their motions are granted in part and denied in part, for the reasons explained below.

### 1. Prison-Like Conditions

Plaintiff maintains that the Joliet TDF was operated like a prison. The Constitution required Defendants to house Plaintiff under "humane conditions" and to provide him with "adequate food, clothing, shelter, and medical care." *Sain v. Budz*, No. 05 C 6394, 2006 WL 539351, *2 (N.D. Ill. Mar. 3, 2006) (Conlon, J.) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)) (internal quotation marks omitted). Like a pretrial detainee, a sexually violent person may not be subjected to conditions that amount to "punishment" without due process. *See, e.g., Youngberg v. Romeo*, 457 U.S. 307, 320-21 (1982). In this regard, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.; see also id.* ("At the same time, this standard is lower than the 'compelling' or 'substantial' necessity tests the Court of Appeals would require a State to meet to justify use of restraints or conditions of less than absolute safety."). "[D]ue process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young*, 531 U.S. 250, 265 (2001); *West v. Schwebke*, 333 F.3d 745, 748 (7th Cir. 2003).

Detainees may nevertheless "be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not be punished." *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003) (citing *Allen v. Illinois*, 478 U.S. 364, 373-74 (1986)). In this regard, the Seventh Circuit has taught:

> Does placement in a prison, subject to the institution's usual rules of conduct, signify punishment? The answer, given by *Bell v. Wolfish*, 441 U.S. 520 (1979), is no. *Wolfish* held that pretrial detainees, who like civil committees may be held for security reasons but not punished, may be assigned to prisons and covered by the usual institutional rules, which are designed to assure safety and security.

14

*Allison*, 332 F.3d at 1079.

Furthermore, in *Hargett v. Adams*, No. 02 C 1456, 2005 WL 399300 (N.D. Ill. Jan. 14, 2005), a sweeping class action lawsuit brought by the American Civil Liberties Union relating to the treatment of sexually violent committees, Judge Leinenweber found that although the "prison-like" environment of the Joliet TDF was not optimally conducive to a "positive therapeutic milieu," the setting did not significantly impede the delivery of effective treatment. *Id.*, 2005 WL 399300 at *2. The fact that Joliet TDF was operated much like a prison did not, itself, violate Plaintiff's constitutional rights. Plaintiff's complaints about the overarching conditions of the prison—*i.e.*, that they are prison-like—appear to have been squarely addressed in *Hargett*. While a plaintiff can avoid the consequences of a general finding in a class action suit by advancing a claim that is materially different from the issues resolved in the class action, the claim as pleaded appears to run foursquare into *Hargett*, which resolved this contention as comprehensively litigated by the ACLU. This claim is dismissed without prejudice. *Id.* at *14.

## 2. The Water at Joliet TDF

The judges of this district have addressed numerous complaints by Illinois prisoners that the water is unsafe in the Joliet area, and those courts have uniformly held that these complaints about the water are not actionable under 42 U.S.C. § 1983. *See, e.g., Ford v. Page*, No. 00 C 1044, 2001 WL 477149, at **4-5 (N.D. Ill. May 3, 2001). More important, the Seventh Circuit has rejected this same claim:

> Many Americans live under conditions of exposure to various contaminants. The Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans. *McNeil v. Lane* . . . [16 F.3d 123, 125 (7th Cir. 1993)]; *Givens v. Jones*, 900 F.2d 1229, 1234 (8th Cir. 1990). It would be inconsistent with this principle to impose

15

upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures.

*Carroll v. DeTella*, 255 F.3d 470, 472-73 (7th Cir. 2001); *see also id.* at 472 (stating that the constitution does not require a confining institution "to provide a maximally safe environment, one completely free from pollution or safety hazards") (citing *McNeil*, 16 F.3d at 125; *Steading v. Thompson*, 941 F.2d 498 (7th Cir. 1991); *Harris v. Fleming*, 839 F.2d 1232, 1235-36 (7th Cir. 1988); *Clemmons v. Bohannon*, 956 F.2d 1523, 1527 (10th Cir. 1992) (en banc)). Plaintiff's claim that he had to drink and wash with contaminated water—*i.e.*, the same water used by the area's general population, including the overwhelming majority of women, men, and children who are not confined there as sexually violent persons but simply live and work in the area—does not state a cognizable claim. This claim is dismissed without prejudice.[2]

### 3. Denial of Privileges for Refusing to Sign a Request for Treatment

Plaintiff claims that he was denied certain privileges and amenities because he refused to sign a form agreeing to participate in the sex offender treatment program; those inmates who agreed to therapy received preferential treatment. (D.E. 1 ¶ 17.) Defendants' motion to dismiss this claim is granted.

---

[2] In his brief, at times Mr. Lieberman appears to attempt to add allegations that the water in Joliet caused him to have skin cancer. Precedent teaches that it is not appropriate to attempt to amend a complaint in a response brief. *See, e.g.*, *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996) (stating that a complaint may not properly be amended by a response to a motion to dismiss); *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984) (same). Mr. Lieberman's is free to amend his complaint as to this issue, although the claim (that the water caused him alleged skin cancer) seems like a difficult one on which to establish any triable case—given that: (1) over 100,000 people live in Joliet and most of them never get skin cancer; (2) numerous people get skin cancer elsewhere.

In *Hargett, supra,* Judge Leinenweber found in favor of the treatment program on identical

claims. Following a full trial, in a class action suit ably litigated by the ACLU on behalf of a class

that encompassed Mr. Lieberman, Judge Leinenweber concluded that it was proper to base the

receipt of privileges on "participation in treatment" and good behavior. Specifically, Judge

Leinenweber ruled:

> The use of a variety of statuses within the TDF that correspond with privileges,
> including room location, increased freedom of movement, and access to certain
> commissary items, is not atypical of institutional and quasi-correctional settings.
> There are rational security concerns underlying the decision to have all patients
> initially begin at a lower end of the privilege continuum: in many instances, the
> staff do not initially know the potential risks of a new patient. In addition, making
> privileges contingent on good behavior and participation in treatment, creates
> positive contingencies and reinforcements for productive therapeutic behavior.

*Hargett,* 2005 WL 399300 at *8.

Pursuant to *Hargett,* Judge Lefkow of this district has recently dismissed a plaintiff's

claim that he was subject to putative "retaliation" in the form of greatly reduced amenities for

refusing to sign a consent-to-treatment form: "[B]ecause Plaintiff has not signed up for the

treatment program, he is not entitled to the same privileges, including better housing, as those

residents who have agreed to treatment. Because this issue has already been addressed and

decided in *Hargett,* Plaintiff's claim . . . is dismissed." *See Williams v. Monahan,* No. 06 C 2447

(N.D. Ill.), D.E. 5 (Minute Order of June 30, 2006) at 2 (Lefkow, J.).

In short, because Plaintiff refused to sign up for the treatment program, he was not entitled

to the same privileges and amenities as those detainees who agreed to undergo treatment. This

court agrees with the rulings made by Judges Leinenweber and Lefkow and adopts their shared

conclusion that the preferential treatment of those who agree to treatment does not violate the

Equal Protection Clause. Moreover, and independently, as Mr. Lieberman was part of the class in the Hargett suit, the ruling in that case is binding upon him.[3]

### 4. Housing of Pretrial Detainees with Committed Persons

Plaintiff asserts that Defendants made "absolutely no attempt to comply" with the dictates of Title 59, Ill. Admin. Code § 299.200, which requires that "detained" persons be kept separate from "committed" persons. (D.E. 1 ¶ 18.) First, precedent is clear that the mere fact that state rules or statutes may have been violated does not in and of itself amount to a constitutional violation or give rise to an actionable Section 1983 claim. *See, e.g., Whitman v. Nesic*, 368 F.3d 931, 935 n.1 (7th Cir. 2004) (collecting cases). In this regard, the Seventh Circuit has stressed that, "[t]he federal government is not the enforcer of state laws." *Pasiewicz v. Lake Co. Forest Pres. Dist.*, 270 F.3d 520, 526 (7th Cir. 2001).[4] Furthermore, Plaintiff alleges no injury resulting from the commingling of committed and pretrial detainees. In the absence of any allegation that a constitutional right was infringed on account of the housing assignments, Plaintiff has no viable cause of action regarding the commingling of pretrial and adjudicated civil detainees. Nor has Plaintiff, who is no longer a pretrial detainee, standing to sue for injunctive relief.

---

[3] Again, a class adjudication is not invariably binding on a class member—at least where his claim is materially different than the one adjudicated in the class proceeding. However, Mr. Lieberman's claim—*i.e.*, that it is unconstitutional to deny him certain privileges or advantages if he refuses to participate in treatment after a jury found him to "dangerous because he or she suffers from a mental disorder that makes it substantially probable that . . . [he] will engage in acts of sexual violence" again, 725 ILCS 207/5(f)—was resolved by Judge Leinenweber. This is not a fact-specific question; it is one fairly resolved as a principle of law, and it was resolved against the class by Judge Leinenweber.

[4] In addition, and independently, even if this Court were ignore the fact that Section 1983 is unavailable to addressed supposed state law errors (otherwise, virtually every case could be litigated in federal court), the regulation Mr. Lieberman cites only encourages the separation of pretrial and committed persons "to the extent possible considering operational, programmatic and security needs." Title 59, Ill. Admin. Code § 299.200.

### 5.    Problems with Mail

Plaintiff may proceed on his claim that DHS officials have supposedly interfered with his

incoming and outgoing mail.  Prisoners have protected First Amendment rights to send and

receive mail.  *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999).  In addition, prisoners have a

constitutional right under the First Amendment to meaningful access to the courts.  *Id.* (citing

*Lewis v. Casey*, 518 U.S. 343 (1996)).  To prove a violation of the right of access to the courts,

Plaintiff ultimately will need to make various showings: The Supreme Court teaches that the right

of access to the courts "is ancillary to the underlying claim, without which a plaintiff cannot have

suffered injury by being shut out of court."  *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Thus, to succeed on a denial of access case, the "plaintiff must identify a 'nonfrivolous,'

'arguable' underlying claim."  *Id.* (quoting *Lewis*, 518 U.S. at 353 and n.3).  In this regard,

precedent further teaches that "[t]o prove a violation [of the constitutional right of access to the

courts], a plaintiff must demonstrate that state action hindered his or her efforts to pursue a non-

frivolous legal claim and that consequently the plaintiff suffered some actual concrete injury."

*May v. Sheahan*, 226 F.3d 876, 883 (7th Cir.2004) (citing *Lewis*, 518 U.S. at 350-54).

For the present time, at least, Mr. Lieberman has stated a putative claim.  While a more

fully developed record may reflect isolated instances of mishandled mail rather than intentional

interference or rampant problems, Plaintiff has articulated a colorable constitutional claim.

### 6.    Disciplinary Proceedings

In Count One, Plaintiff challenges two disciplinary reports which he claims were

fabricated.  Plaintiff additionally contends that he was not afforded due process in connection with

either report. The Court agrees with Defendants that Plaintiff may be disciplined for rule infractions; however, the Court disagrees that Plaintiff is not entitled to procedural due process.

In *Thielman v. Leean*, 282 F.3d 478 (7th Cir. 2002), the Seventh Circuit applied the seminal case of *Sandin v. Connor*, 515 U.S. 472 (1995), to civilly detained individuals. In *Sandin*, the Supreme Court held that state-created liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484 (citations omitted).

Although *Sandin* involved prison discipline, the Seventh Circuit applied the same reasoning to the civil detainee setting. In *Thielman*, a Wisconsin detainee committed under that state's sexually violent persons statute challenged the use of restraints during transport from the detention facility to an outside medical hospital or clinic. *Thielman* upheld the use of restraints, noting,

> [s]omeone is involuntarily committed, generally speaking, because his mental illness makes him a safety risk to himself or others. Accordingly, his commitment entails some sort of restraint, and that restraint is often significant. The *Sandin* rule simply gives state officials some discretion in determining how much restraint is necessary in a given situation . . . .

*Thielman*, 282 F.3d at 483 n.1. Moreover, the Seventh Circuit has held that civil detainees, just like prisoners, are subject to security measures typically used at correctional facilities. *See Allison*, 332 F.3d at 1079 ("If pretrial detainees may be subjected to the ordinary conditions of confinement, as *Wolfish* holds, then so may persons detained before trial as sexually dangerous persons.").

In *West, supra,* the Seventh Circuit explicitly addressed discipline and related behavioral restrictions as to the State of Wisconsin's Sexually Violent Persons Commitment Program and held:

> To the extent that plaintiffs are uncontrollably violent, and thus pose a danger to others, Wisconsin is entitled to hold them in segregation for that reason alone; preserving the safety of the staff and other detainees takes precedence over medical goals. So we said in *Thielman v. Leean,* 282 F.3d 478 (7th Cir. 2002) .... Just as a pretrial detainee may be put in isolation–indeed, may be *punished* for violating institutional rules, provided that the jailers furnish notice and an opportunity for a hearing, see *Higgs v. Carver,* 286 F.3d 437 (7th Cir. 2002)–so a civil detainee may be isolated to protect other detainees from aggression. Institutions may employ both incapacitation and deterrence to reduce violence within their walls .... (emphasis in original).

*Id.,* 333 F.3d at 748.

Illinois' SVP regulations themselves do not create any additional rights. To the contrary, the Illinois Administrative Code, *see* 59 Ill. Admin. Code 299.620 *et seq.,* gives the staff considerable discretion with regard to institutional disturbances, safety and security measures, and room confinement. The rules also provide for differing management levels, from "secure management" status to "high privilege" status. *See* Section 299.600. The withdrawal of positive incentives is intended to discourage misbehavior and encourage appropriate activities. *Id.*

Nevertheless, despite the availability of disciplinary sanctions, as well as the wide latitude afforded the TDF staff in their management of the detainees in their care, the Court cannot adopt Defendants' implicit contention that they must be granted *carte blanche* to discipline civil detainees. Even in upholding disciplinary measures in the SVP setting, the Seventh Circuit in *West* took care to note that detainees must receive notice and an opportunity to be heard. *Id.,* 333 F.3d at 748.

The exact contours of due process required can be addressed by more focused briefing as the case goes forward. Mr. Lieberman contends that he is entitled to various due process rights, citing *Ehrlich v. Mantzke*, No. 01 C 7449, 2002 WL 265177 (N.D. Ill. Feb. 25, 2002). Defendants cite various cases and suggest that much less process is required. *See, e.g., Holly v. Woolfolk*, 415 F.3d 678 (7th Cir. 2005). The briefing on this issue is not fully comprehensive, and potential open factual issues also may intersect so as to bear on the appropriate analysis. For the present time, at least, the Court will err in Plaintiff's favor (subject to refinement as the case proceeds) and allow these claims to go forward. Plaintiff may proceed on his claims that he was deprived of due process with regard to the disciplinary reports cited in Count Two.[5]

### 7. Grievances

Plaintiff complains that his grievances were routinely denied without any substantive review. A prison official can be liable under 42 U.S.C. § 1983 for failing to respond to violations of a prisoner's constitutional rights that come to his or her attention via the grievance process. *See Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). This, however, occurs (if it occurs) as a consequence of the official's duty under federal law to prevent and remedy constitutional violations, not a duty to respond to grievances. There is no constitutional right to an institutional grievance procedure. Illinois statutes and

---

[5] In proceeding forward on this theory, the Court acknowledges that a "due process" violation is not shown (and is not litigable) simply because a litigant claims that a prison or institution confining the plaintiff erred in its adjudication of a grievance. *See, e.g., Lagerstrom v. Kingston*, 463 F.3d 621, 625-26 (7th Cir. 2006). This is true even where the plaintiff alleges that the prison or institutional officials knowingly interjected perjured or false evidence into the adjudication. *See, e.g., id.* at 624-25 ("The fact (if it were true) that the evidence [in the lieutenant's disciplinary report] against Lagerstrom had been made up would similarly not cast doubt on the basic procedures that were followed. The system has direct remedies for perjury. Here, Lagerstrom received all the process he was due.") (collecting cases; internal citations omitted).

regulations establishing the Department of Corrections' grievance procedures do not create a liberty interest under the Fourteenth Amendment's due process clause. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996). Therefore, Plaintiff may proceed against supervisory officials who were aware of his grievances and in a position to assist him with regard to putative constitutional violations, but he has no independent cause of action for failure to respond to, or rule favorably on, his grievances.

### 8. Disqualification of Plaintiff's Primary Therapist

In Count One and again in Count Four, Plaintiff alleges that Defendant Kegel, Plaintiff's primary therapist, was discharged after it was discovered that he was unlicensed. Plaintiff asserts that Kegel was unqualified to make any decisions regarding Plaintiff's treatment; he further contends that Kegel intentionally made false entries in Plaintiff's records to justify his commitment. Kegel has never been served.

To the extent that Plaintiff argues that any diagnoses and treatment decisions made by Kegel should be nullified, Plaintiff's suit runs up against *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). Plaintiff cannot sue for damages under § 1983 for his allegedly unconstitutional confinement, or for other harm caused by actions whose putative unlawfulness would render his commitment invalid, until that commitment has been declared invalid through the proper channels provided by state law and/or federal habeas review. *Id.* A finding that Kegel's inexpert and erroneous assessments played a major part in Plaintiff's civil commitment would, if true, potentially call into question the validity of that commitment—although even if Kegel were inexpert, for example, ultimately another unquestionable expert might agree with the assessments in follow-up proceedings. In addition, some threats may be so obvious (the Court expresses no

view about whether Mr. Lieberman would fall into this category) that any reasonable person, expert or otherwise, would appreciate them. In any event, if Plaintiff wishes to contest the validity of his civil commitment in federal court on the ground that Kegel was not competent, he must file a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *Cain v. Ryan*, 171 F.Supp.2d 813, 823 (N.D. Ill. 2001) (Gettleman, J.) (collecting cases). This claim is dismissed. *Accord, e.g., Heck*, 512 U.S. at 486-87; *Cain*, 171 F.2d at 823 (collecting cases).

### 9. Putative Obstacles to Receiving Visitors

Plaintiff contests the cumbersome nature of visitation privileges. A detainee, however, retains only those rights that are consistent with his detention or incarceration. *See, e.g., Shaw v. Murphy*, 532 U.S. 223, 229 (2001); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977). "[F]reedom of association is among the rights least compatible" with such detention or incarceration. *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (citing, *inter alia, Jones, supra*, at 125-126). Some curtailment of that freedom must be expected in the institutional context.

As a sexually violent person, Plaintiff's claims are governed by the "professional judgment" standard set out in *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982). In *Youngberg*, the Supreme Court held that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 457 U.S. at 321-22. "'Due process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed.'" *West*, 333 F.3d at 748 (quoting *Seling*, 531 U.S. at 265). Nevertheless, under the professional judgment standard, it is not appropriate for the courts to

specify which of several professionally acceptable choices should have been made. *See Youngberg*, 457 U.S. at 321. A violation of the "professional judgment" standard will be found to exist only when the complained of practice constitutes "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* at 323; *accord, e.g., West*, 333 F.3d at 749 ("[A]ll the Constitution requires is that punishment be avoided and medical judgment be exercised."); *Hargett*, 2005 WL 399300 at *13 (same).

The same concerns relevant to the prison context (escape, assault, introduction of weapons and other contraband) apply equally to a detention facility for sexually violent offenders. *See, e.g., West*, 333 F.3d at 748. Therefore, advance registration of guests, searches of inmates before and after visits, monitoring of the visit room, and the other security precautions described by Plaintiff are constitutionally valid for the same reason the courts have found them to be reasonable in the prison setting. In *Hargett*, the class suit, Judge Leinenweber already ruled that family members are not unreasonably excluded from visiting detainees. *Hargett*, 2005 WL 399300 at *13. As explained, Mr. Lieberman was a member of the plaintiff class; he offers no explanation as to how that judgment about the validity of the regulations is not equally binding here. This claim is dismissed without prejudice.

### 10.  Retaliation

Plaintiff may be able to establish claims of retaliation and equal protection. Inmates are entitled under the First Amendment to file grievances and lawsuits, and officers may not retaliate against them for exercising those rights. *Walker v. Thompson*, 288 F.3d 1005, 1008-09 (7th Cir. 2002). If Plaintiff and his visitors were singled out for harassment and extra hurdles on account

25

of his grievances, prior litigation, or other impermissible concerns, he may be entitled to redress for the discriminatory treatment. Plaintiff may proceed on his retaliation claims recounted in Count Three.

### 11. Conditions in Segregation

Plaintiff states that when he was placed in segregation in November 2001, he was denied exercise privileges and all personal property. This claim will require further factual development.

As discussed in preceding paragraphs, Plaintiff's placement in a less-desirable housing unit for violation of facility rules would not violate his constitutional rights. *See, e.g.*, *West*, 333 F.3d at 748. It is not unreasonable to treat detainees who follow rules differently than those who do not. However, depending upon the length of time Plaintiff spent in segregation, the conditions of his confinement may conceivably have risen to the level of a constitutional violation. *See, e.g.*, *Dixon v. Godinez*, 114 F.3d 640, 646 (7th Cir. 1997).

If Plaintiff was denied the opportunity to exercise for protracted periods, he might be entitled to relief under 42 U.S.C. § 1983. Precedent teaches, however, that "[u]nless extreme and prolonged, lack of exercise is not equivalent to a medically threatening situation." *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988). There is a significant difference between a lack of outdoor or extensive recreation opportunities (such as may occur in segregation, or can occur generally at a facility any time it is required to go onto lockdown status) and an inability to exercise at all. *See id.* An inmate confined to the segregation unit retains the ability to improvise an exercise regimen in his cell or unit. *Id.*

By the same token, the denial of "all personal property" could rise to the level of constitutional magnitude depending upon what Plaintiff means by "all" and how long he went

without his belongings. Being placed in a cell with no clothes, no toiletries, etc., would be more serious a deprivation than, say, simply being denied a television (which may be part of the sanction of segregation, for example, if prompted by rules violations or threats to others). Furthermore, the length of time Plaintiff was supposedly denied his personal property would be a factor in determining whether his constitutional rights were violated. But at this stage of the proceedings, Plaintiff has articulated potentially colorable claims. It is not the case that he could prove "no set of facts" entitling him to relief under 42 U.S.C. § 1983 with respect to the conditions of segregation. Further factual development will be required.

### 12. Conditions in General Population

#### (a) Food

Plaintiff has stated a viable claim regarding the food at the Joliet TDF. Defendants are correct that some of Plaintiff's quibbles do not implicate the Constitution: being served "the same cereals for weeks," receiving meals that are "not hot enough," and having to consume a lot of "processed" meat are not actionable under 42 U.S.C. § 1983. (D.E. 1 ¶ 115.) Nevertheless, Plaintiff goes on to assert, "[t]he food is unhealthy and is not just unappetizing but is low in protein, high in fat and sugar and has caused numerous residents to be diagnosed with diabetes. . . . On paper, the diet is healthy, balanced and proper but in actuality, the food is below acceptable standards." (*Id.*)

Precedent reflects that detainees and prisoners have a constitutional right to a nutritionally adequate diet. *See, e.g., Antonelli*, 81 F.3d at 1432. "[T]he state must provide an inmate with a 'healthy, habitable environment.'" *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) (internal quotation marks and citation omitted). This entails "providing nutritionally adequate

27

food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Id.* To survive a motion for summary judgment, Plaintiff will have to prove his claims, of course. But his allegations are sufficient to withstand a motion to dismiss.

### (b) Cell Searches

Plaintiff's objection to cell searches is precluded by *Hargett*. In that case, Judge Leinenweber found:

> Patients' rooms are routinely searched for contraband. Although this feature is more akin to a prison environment, as opposed to a forensic mental hospital or other treatment facility, Defendants presented evidence that numerous items, including a makeshift knife ("shank") and devices to conceal contraband, have been uncovered as a result of these searches. Thus, there are legitimate institutional security concerns underlying the room searches.

*Hargett*, 2005 WL 399300 at *3. Judge Leinenweber went on to conclude:

> [T]he room and personal searches, use of the black box, use of close management status, and use of intercoms, are not substantial departures from accepted professional judgment and standards, and therefore are constitutionally permissible. Specifically, as noted above under the Findings of Fact, there are legitimate security and institutional concerns underlying these policies that indicate that professional judgment is being properly exercised.

*Id.*, 2005 WL 399300 at *16. Consequently, Plaintiff's claim regarding cell searches is dismissed without prejudice. This dismissal does not affect Plaintiff's retaliation claim, which is a separate concern.

### © Noise

Plaintiff claims that noise levels at the Joliet TDF were so overwhelming that he could not hear his television in his cell, even with his door closed. (D.E. 1 ¶ 118.) Plaintiff says that he filed "literally dozens" of grievances regarding the "torturous and mentally destabilizing" noise.

(D.E. 93 at 11-12.) Subjection to constant and unnecessary noise, even if it does not inflict enduring injury, may possibly rise to the level of a constitutional violation. *See Antonelli*, 81 F.3d at 1433 (citation omitted). Although Defendants maintain that Plaintiff's assertions are factually "preposterous," they are not so implausible as to be legally frivolous. *See, e.g., Edwards v. Snyder*, 478 F.3d 827, 829 (7th Cir. 2007) ("A claim is factually frivolous if its allegations are bizarre, irrational or incredible"). Plaintiff may proceed on his claim regarding unendurable noise levels.

## C. Personal Involvement

Defendants contend that Plaintiff has failed to state a cause of action against "upper level officials." It is true that liability under 42 U.S.C. § 1983 requires a defendant's direct, personal involvement. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, "[u]nder any theory, to be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Village of Oak Park*, 430 F.3d 809, 810 (7th Cir. 2005) (collecting case; internal quotation marks omitted). The doctrine of *respondeat superior* does not apply to actions filed under 42 U.S.C. § 1983. *See, e.g., Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001) (collecting cases). To be held liable under 42 U.S.C. § 1983, supervisors "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* (internal quotation marks and citation marks omitted); *see also Vance*, 97 F.3d at 992-93 ("As we have noted previously, a supervising . . . official cannot incur § 1983 liability unless that officer is shown to be personally responsible for a deprivation of a constitutional right.") (collecting cases).

29

Nevertheless, *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996), teaches that dismissal of a *pro se* complaint on grounds of lack of active personal involvement is inappropriate where the official's position justifies an inference that the official had some direct involvement in the alleged violation. *Antonelli* concerned sweeping claims of unconstitutional conditions of confinement. In that case, the Court of Appeals found that an inference of involvement was justified to sustain claims asserted against certain senior officials, such as the county sheriff or the prison warden, where the claims alleged "systemic," rather than "localized," constitutional violations. *Id.* at 1428-29. In the case at bar, Plaintiff's claims focus on non-localized, systemic putative violations—he takes issue with numerous aspects of the conditions of his confinement. Furthermore, Plaintiff contests express policies of Liberty Healthcare. *Compare Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002).[6] The complaint sets forth arguable claims against supervisory officials, at least at this early stage.

**D.      Qualified Immunity**

Defendants' motion to dismiss on grounds of qualified immunity is respectfully denied. "[A] complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) (citation omitted). Defendants may wish to renew their affirmative defense of qualified immunity in a properly supported motion for summary judgment, but the claim cannot be granted at this stage of the proceedings. *See, e.g., id.*;

---

[6] Liberty is alleged to be a contractor of the State of Illinois. No argument is made that Liberty is not a state actor for purposes of Section 1983.

*see also Senty-Haugen v. Goodno*, 462 F.3d 876 (8th Cir. 2006) (affirming summary judgment dismissal of various claims brought by civilly-committed sex offender in Missouri).[7]

## E.     Mootness of Claims for Injunctive Relief

It would seem that some or all of Plaintiff's claims for injunctive relief may have been mooted by his transfer to the new facility in Rushville. Certainly, he is no longer subject to the conditions of confinement presented in the old wing at the Joliet Treatment and Detention Facility. If a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless he can demonstrate that he is likely to return to that prison. *See, e.g., Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (per curiam). However, Plaintiff's claims concerning alleged mistreatment by DHS and Liberty officials may be ongoing. Therefore, the Court will not at this time address the issue of mootness.

## CONCLUSION

In view of the foregoing, Defendants' motions to dismiss (D.E. 76 and 84) are respectfully granted in part and denied in part. The following claims are dismissed pursuant to Fed. R. Civ. P. 12(b)(6), subject to the conditions stated above:  (1) that the Joliet TDF was operated like a prison; (2) that the water was contaminated; (3) that inmates who consented to treatment received preferential treatment; (4) that pretrial and adjudicated detainees were housed together; (5) that officials denied grievances without substantive review or reached incorrect substantive outcomes; (6) that Kegel's entries in Plaintiff's mental health records were invalid; (7) that visitation requirements were unduly burdensome; and (8) that excessive cell searches were conducted.

---

[7] The Court assumes that Mr. Lieberman is not attempting to state any monetary claims against state officials in their official capacities. Such suits would be barred by the Eleventh Amendment. *See, e.g., MSA Realty Corp. v. State of Illinois*, 990 F.2d 288, 291 (7th Cir. 1993).

Plaintiff may proceed on the following claims: (1) mishandling of mail; (2) denial of due process in connection with disciplinary proceedings; (3) retaliation for grievances and lawsuits; (4) conditions in segregation (denial of exercise and personal effects); (5) non-nutritious food; and (6) overwhelming noise. It is further ordered, on the Court's own motion, that Carol Adams is dismissed as a Defendant (counsel apparently entered an appearance for her in error).

_Mark Filip_
Mark Filip
United States District Judge
Northern District of Illinois

Dated: _June 19, 2007_