# IN THE
## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Brad Lieberman, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 03 C 2009 |
| | ) |
| Timothy Budz, et al. | ) Judge Robert W. Gettleman |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Brad Lieberman, is a civil detainee committed under the Illinois Sexually Violent
Persons Commitment Act ("SVPA"), 725 ILCS 207/1, et seq. Currently, he is detained at the Rushville
Treatment and Detention Facility. He initiated this 42 U.S.C. § 1983 suit in October of 2003, while he
was detained at the Joliet Treatment and Detention Facility ("Joliet Facility"), where he was confined
from 2000-2006. The case was initially assigned to the Honorable Harry Leinenweber. Plaintiff's
complaint named 17 defendants and asserted numerous challenges to the conditions at the Joliet
Facility. The court dismissed several claims on initial review, and later stayed the case pending the
resolution of a case with similar claims. *Tiney-Bey v. Peters*, No. 99 C 2861. During the stay, the
Executive Committee of this Court reassigned the case to the Honorable Mark Filip. In November of
2006, the court lifted the stay.

By order of June 19, 2007, Judge Filip dismissed eight claims when he granted in part
defendants' motion to dismiss.[1] Six claims remain: (1) plaintiff did not receive advance notice of

_____

[1] The June 19, 2007, Memorandum Opinion summarizes Plaintiff's offenses, the history of
his custody and detention, and his litigation history. The court refers to the background discussion
in that order, rather than restating that history in its entirety here. (Docket Entry # 95, Memorandum
Opinion of June 19, 2007 (J. Filip)). Briefly noted, Brad Lieberman (aka "the plumber rapist") was
convicted in 1980 in Lake and Cook Counties for rape and attempted rape. As described by the
Illinois Appellate Court, Plaintiff's multiple rapes involved the same *modus operandi*: he entered
(continued...)

charges before disciplinary hearings, and the defendants did not afford him the opportunity to call witnesses or present evidence at the hearings; (2) the defendants mishandled plaintiff's mail; (3) the defendants retaliated against plaintiff for filing suits and grievances and for complaining about not receiving protein supplements; (4) the conditions in segregation confinement were unconstitutional; (5) the quality of the food at the facility was so low that it amounted to a constitutional violation; and (6) plaintiff had to endure excessively loud noise. In November of 2007, plaintiff settled with and dismissed his claims against Defendants David Kegel, Shan Jumper, Fran Aden, Travis Hinze, Raymond Wood, and Liberty Health Care Corporation. Remaining defendants are Timothy Budz, Thomas Monahan, Linda Baker, James Kitanski, Sy Hopson, Robert Glotz, Shane Tooley, Douglas Collins, and G.C. Henderson.

In March of 2008, the Executive Committee again reassigned the case to the Honorable James Moran. In April of 2009, the Committee then reassigned the case to this court. The remaining defendants have filed a motion for summary judgment with respect to the six remaining claims.

---

[1](...continued)

the homes of his female victims by posing as a plumber or as a police officer working part time as a plumber; stating that he was looking for a leak, he walked with the victim through the apartment to ensure that no one else was home; he indicated that the leak was behind the victim's bedroom closet and instructed the victim to empty the closet; while the victim removed items from the closet, he would grab her from behind, hold a knife to her throat, instruct her not to scream, and inform her that he had cut up prior victims. *People v. Lieberman*, 438 N.E.2d 516, 518-19 (Ill.App. 1 Dist. 1982). After plaintiff served 20 years of a 40-year sentence and prior to his scheduled January 9, 2000 release date, the State of Illinois commenced commitment proceedings under the SVPA, which allows for the commitment of persons with a "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West Supp.2000). After appeals to the state appellate and supreme courts, a commitment trial was ultimately conducted five years later, and a jury found that plaintiff was a sexually violent person. *See Lieberman v. Thomas*, 505 F.3d 665, 668 (7th Cir. 2007). Plaintiff filed several state and federal actions challenging his commitment, all of which have been denied. As noted by the Seventh Circuit when denying one of those challenges, "[t]o say that Lieberman challenged the State of Illinois' petition to have him civilly committed would be an understatement." *Lieberman v. Thomas*, 505 F.3d at 666, 668-72.

Plaintiff has filed a motion for summary judgment for his claim that the defendants denied him procedural due process rights with disciplinary hearings. The parties have responded to each others' motions.

For the following reasons, the court denies plaintiff's summary judgment motion. The court denies in part and grants in part the defendants' summary judgment motion. The court denies summary judgment for the defendants for plaintiff's claims that the defendants interfered with his mail, that the defendants retaliated against plaintiff when they disciplined him for complaining about not getting protein supplements, and that the quality of the food was so lacking that it amounted to a constitutional violation. Plaintiff may proceed with these claims. The court grants summary judgment for the defendants for plaintiff's other claims and dismisses the other claims with prejudice.

## STANDARD OF REVIEW

### I.     Summary Judgment under Federal Rule of Civil Procedure 56

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). In determining the existence of a genuine issue of material fact, the court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396.

The movant bears the initial burden of demonstrating that there is no genuine issue of material fact and that judgment based upon the uncontested facts is warranted. *See Celotex Corp.*, 477 U.S. at 325. If the movant meets this burden, the nonmoving party must "go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (internal quotation marks

and citations omitted); *Celotex*, 477 U.S. at 322-26. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if a reasonable finder of fact could return a decision for the nonmoving party based upon the record. *See Anderson*, 477 U.S. at 252; *Insolia v. Phillip Morris Inc.*, 216 F.3d 596 (7th Cir. 2000).

## II. Northern District of Illinois Local Rule 56.1 Statements

Because plaintiff is a *pro se* litigant, the defendants served him with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by Northern District of Illinois Local Rule 56.2. The notice explains the consequences of failing to properly respond to a motion for summary judgment and to a statement of material facts under Fed. R. Civ. P. 56(e) and Local Rule 56.1.

When determining summary judgment motions, the court derives the background facts from the parties' Local Rule 56.1 Statements. Local Rule 56.1 assists the court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Specifically, Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). The nonmoving party must admit or deny every factual statement proffered by the moving party and concisely designate any material facts that establish a genuine dispute for trial. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). The parties' statements must contain short numbered paragraphs including references to the affidavits, parts of the record, and other supporting materials. *Id.*; *see also Ammons*, 368 F.3d at 817.

The purpose of a Local Rule 56.1 Statement is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th

Cir. 2006). The types of evidentiary material available to support a Local Rule 56.1 statement are numerous, but the most common materials include affidavits, deposition transcripts, and business documents. *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). In addition, "hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see, e.g., Keri v. Board of Tr. of Purdue Univ.*, 458 F.3d 620, 630 (7th Cir. 2006).

A litigant's failure to respond to a Local Rule 56.1 Statement results in the court considering the uncontroverted statement as true. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The court may disregard statements and responses that do not properly cite to the record. *See Cichon v. Exelon Generation Co., L/L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005); *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997). The requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon*, 233 F.3d at 528.

Although courts must construe *pro se* pleadings liberally, see *Kaba v. Stepp*, 458 F.3d 678, 681 (7th Cir. 2006), a plaintiff's *pro se* status does not absolve him from complying with these Local Rules. *See Greer v. Board of Ed. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001); *see also McNeil v. United States*, 508 U.S. 106, 113 (1993) ("we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel.")

With these standards in mind, the court turns to the claims and evidence of this case. Because plaintiff's claims do not stem from one set of facts, but instead are based upon distinct events and conditions, this opinion discusses the facts associated with each claim in the section for that claim.

## DISCUSSION

### I. Behavior Committee Meetings

Plaintiff's summary judgment motion argues that he was denied due process with respect to four

disciplinary hearings (known as Behavior Committee ("BC") meetings) in May or June 2001, December 2001, and January 2003. Plaintiff states that he did not receive advance notice of the charges before the hearings and that he did not have the opportunity to call witnesses or present evidence at the hearings. (R. 111, Pl.'s Rule 56.1 Statement ¶¶ 10-18; *see also* R.113, Pl.'s Summary Judgment Motion.) The defendants acknowledge in their summary judgment motion that plaintiff did not receive advance notice of the charges or the ability to call witnesses. The defendants contend, however, that such due process protections did not apply to plaintiff's BC meetings because the restrictions he received did not amount to punishment. They further contend that, even if the imposed restrictions required advance notice and the ability to call witnesses, the defendants are entitled to qualified immunity because the right to the procedural protections was not clearly established at the time of the BC's actions. (R. 134, Defs' Memorandum in Support of Summary Judgment, pp. 5-9.)

As discussed in the analysis part of this section, plaintiff's entitlement to advance notice and the ability to interview witnesses depends upon whether the restrictions resulting from the BC meetings constituted punishment and, if they were punishment, whether the punishment rose above the level of *de minimus.* If such procedural due process protections applied to the restrictions, the court must then consider whether the right was not clearly established at the time, such that defendants are entitled to qualified immunity. The facts leading to the BC meetings are not necessarily material for determining these issues. In fact, neither plaintiff nor the defendants address the background facts for disciplinary hearings in their Rule 56.1 Statements. (*See generally* R. 111, Pl.'s Rule 56.1 Statement; R. 132, Defs.' Rule 56.1 Statement, ¶¶ 14-17). The court nonetheless briefly discusses the facts preceding the four BC meetings. Some of these facts are relevant for plaintiff's other claims, and a discussion of these facts assists to better understand this case.

## A.    First Behavior Committee Meeting

Plaintiff states that, in May 2001, one of his attorneys asked plaintiff to provide names of persons who could testify about plaintiff's daily activities and general behavior at the Joliet Facility. Because plaintiff was not enrolled in any treatment programs, he was only able to provide the names of security guards and two staff members. Plaintiff states that the guards had no objection to being called as witnesses, but that staff member James Kitanski refused. "When Kitanski indicated . . . his unwillingness, Plaintiff did not persist and simply thanked him, and walked away." (R. 1, Complaint ¶ 21.) A day later, a Joliet Facility staff person told plaintiff to report to the Behavior Committee ("BC"), which consisted of Hinze (committee chairperson), Tooley, and Kegel. (*id.* at ¶ 22; R. 132-3, Pl.'s Depo., p. 27.) The BC did not inform plaintiff of the specific charge against him, but only generally informed him that he was accused of giving false information to an employee. Plaintiff states that he was not allowed to interview witnesses. (R. 1, Complaint ¶¶ 22-25.)

A report of a BC meeting from June 12, 2001, states that plaintiff committed a rule violation of "giving false information to an employee." (R. 113, Pl.'s Motion for Summary Judgment, Tab 3.) The report states that Kitanski refused plaintiff's request to testify on plaintiff's behalf and that, when Kitanski informed Security Therapy Aid ("STA") Kim Sandstrom that her name was on a list of character witnesses prepared by plaintiff, Sandstrom stated that she never agreed to testify for plaintiff or to have her name included on such a list. Sandstrom stated in a deposition that she never gave plaintiff permission to put her name on a list, that she wrote a report stating that plaintiff had asked her to be a character witness and that she refused, and that she never testified about this incident (presumably at the June 12, 2001, meeting). (*Id.* at Tab 9, Sandstrom's Depo., pp. 24-38.)

The BC determined that plaintiff had committed a major rule violation of giving false information to an employee and reduced plaintiff's status from "responsible" to "general." (*Id.* at Tab 3.) The report does not specify the effects of the reduction in status; however, plaintiff states that he

received "reduced privileges for 6 months; disfavorable housing unit assignment; reduction in 'state pay points'; reduced visiting time; earlier lock-up time and other restrictions." (R. 1, Complaint ¶ 24.) Plaintiff may have also been confined to his room for five to seven days and been on unit restriction for 30 days, which would have prevented him from "going to the yard," prevented him from attending certain special events, and required earlier lock-up times. (R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., p. 39, 43-44) (it is unclear from plaintiff's deposition whether these restrictions followed his first or second BC meeting).

## B.    Second Behavior Committee Meeting

Several days after the June 12, 2001, BC meeting, plaintiff was again called before the BC. A report dated June 17-18, 2001, states that plaintiff committed a rule violation of "intimidation and threats to an employee." (R. 113, Pl.'s Summary Judgment Motion, Tab 4.) Kitanski had reported that plaintiff shook his fist at Kitanski, which he believed was a threatening gesture. (*Id.* at Tab 10, Kitanski's Depo., pp. 49-50.) Again, plaintiff did not have advance notice of the meeting. The BC found that plaintiff had committed a rule violation of intimidating an employee, and reduced plaintiff's status from "general" to "close." (R. 113, Pl.'s Summary Judgment Motion, Tab 4.)

According to plaintiff, the Joliet Facility did not have a segregation unit at that time. "Close management status" meant that he was confined to his room for a period of five to seven days and was on unit restriction for at least 30 days. (R. 132-3, Defs.' Rule 56.1 Statement, Exh. C., Pl.'s Depo. pp.43-44.) He was "denied any access to outdoor or indoor exercise. Plaintiff had to be handcuffed any time he left the unit. Plaintiff's visits were reduced to one hour and he had to wear handcuffs during visits. Plaintiff was denied his audio, visual and electronic equipment. Plaintiff's 'state pay' points were reduced to 1-point per week He was forced to lock-up in his prison cell even earlier." (R. 1, Complaint ¶ 33.) "They took my property. They stopped me from having a job. I had reduced visiting times. Reduced ability to earn points. Once I was off the lock down status, I could not go to the yard.

I had to lock up at 9:00 at night; everybody else got to stay out until 10:45. And . . . I was on reduced status, which reduced my privileges, including not being able to go out to . . . certain special events." (R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., p. 39.) Plaintiff also alleged that the BC's report was used against him in a civil commitment proceeding. (R. 1, Complaint ¶ 37.)

## C.     Third Behavior Committee Meeting

On December 20, 2001, the BC again found that plaintiff had given false information. (R. 113, Pl.'s Summary Judgment Motion, Tab 11.) According to plaintiff, a doctor diagnosed plaintiff with Graves disease, a hyperthyroid, protein deficient condition. After protein supplements purchased for plaintiff were returned by Joliet Facility staff members, plaintiff had one of his attorneys contact a Department of Human Services attorney. Plaintiff contends that the BC falsely charged him with giving false information about having a doctor's order for protein supplements in retaliation for "going over their heads." (R. 1, Complaint ¶¶ 85-89.)

The December 20, 2001, BC meeting report states that plaintiff informed a staff member that a doctor had prescribed dietary supplements for plaintiff. An investigatory phone call to the doctor revealed that plaintiff falsely reported to the doctor that plaintiff had recently lost 30 pounds. The doctor denied that he ordered protein supplements for plaintiff, and records revealed that plaintiff had no significant weight loss while at the Joliet Facility. The BC determined that plaintiff had committed a rule violation of "giving false information," and the BC placed plaintiff on "close status." (R. 113, Pl.'s Summary Judgment Motion, Tab 11.)

"Close status" or "close management status" at that time meant confinement in a segregation unit of the Joliet Facility. (R. 132-3, Defs.' Rule 56.1 Statement Exh. C, Pl.'s Depo., p. 40.) Plaintiff states that he was placed in segregation for 58-60 days. He was "locked in a barren prison cell and all my property was locked up in storage. You know, even when I was . . . in segregation in prison, I had a TV set . . . all of my stuff, my typewriter, my hot pot, my razor, my clothing, my legal material, my

pictures, things that had absolutely no relevance to a security issue, . . . were taken away from me." (R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., p. 66.) He had to wear a yellow jumpsuit and handcuffs during visits, visits were limited to one hour, and, when being transported outside the facility, he had to wear a jumpsuit, handcuffs, leg irons, and a waist chain, which embarrassed and humiliated him. (R. 1, Complaint, ¶¶ 96-99.) He acknowledged that he had underwear, socks, toiletries, library books, and sheets and blankets for his bed, and that he was taken to the day room for several hours in the morning and several hours in the afternoon. There was a television in the day room, but it was set to the Black Entertainment Television station. (R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., pp. 40-41, 66-69.)

## D. Fourth Behavior Committee Meeting

The fourth BC meeting occurred in January 2003. Although the record does not contain the report of that meeting, plaintiff's complaint and deposition indicate that an incident between plaintiff and STA Douglass Collins precipitated the meeting. Plaintiff states that Collins regularly harassed plaintiff by aggressively searching his female visitor and by accusing plaintiff of engaging in inappropriate behavior with his visitor. (R. 1, Complaint ¶¶ 49-51.) On January 11, 2003, Collins harassed plaintiff by standing in extremely close proximity to plaintiff and his visitor. When the visitor asked to use the bathroom, Collins ordered that a guard search the visitor by touching her pockets, and Collins inappropriately held his ear to the bathroom door to listen to her use the toilet. When plaintiff asked to use the bathroom, Collins made plaintiff use the bathroom in his unit of the facility, far from the visiting room. That afternoon, plaintiff asked Collins why he harassed plaintiff. Collins replied that he did not know what plaintiff was talking about. Plaintiff then told Collins, "You can treat me like this, but you can't treat my visitor like she is a criminal." Collins yelled in response, "Are you threatening me?" (*Id.* at ¶¶ 54-55.)

On January 15, 2003, plaintiff received a piece of paper directing him to appear for a BC meeting for "possible intimidation and threats." Plaintiff never received a copy of the charge, nor was it read to him. (*Id.* at ¶ 56.) Plaintiff was not placed in segregation, but he received six months of reduced privileges, i.e., less visits, earlier lock-up times, reduction in state-pay points, and less recreational activities. (*Id.* at ¶ 64; R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., p. 44.)

## E.    Analysis

Viewed in a light most favorable to plaintiff, the evidence shows that he did not receive advance notice or an opportunity to interview witnesses with respect to four BC meetings. The lesser restrictions resulting from the BC meetings included earlier lock-up times, shorter visitation periods, reduction in pay, reduction in classification status, and reduction of certain recreational activities. (R. 1, Complaint ¶¶ 24, 33, 64; R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., pp. 40-41, 43-44.) The more serious restrictions included confinement to a segregation unit for 58-60 days, confinement to his room for five to seven days, separation from his personal items and an inability to exercise during these periods, unit restriction for thirty days, and the wearing of handcuffs during visits and additional restraints during trips outside the Joliet Facility. (R. 1, Complaint ¶¶ 33, 96-99; R. 132-3, Defs' Rule 56.1 Statement, Exh. C, Pl.'s Depo., pp. 39-41, 66.)

The defendants argue that, constitutionally, plaintiff was not entitled to advance notice and the opportunity to call witnesses with respect to the BC meetings. (R. 134, Defs.' Memorandum in Support of Motion for Summary Judgment, pp. 5-7.) They further contend that they are entitled to qualified immunity because plaintiff did not have a clearly established right to such procedural due process protections at the time of the BC actions. (*Id. at* 8-9.)

Although it is unclear whether the restrictions were serious enough to require advance notice and an opportunity to call witnesses, the right to such procedural protections was not clearly established at the time of the BC's actions, and the defendants are entitled to qualified immunity.

### I.  The Right to Advance Notice and the Opportunity to Call Witnesses

Persons detained under the SVPA are entitled to at least the same rights as pretrial detainees. *See West v. Schwebke,* 333 F.3d 745, 748 (7th Cir. 2003). "A person held in confinement as a pretrial detainee may not be subjected to any form of punishment for the crime for which he is charged." *Rapier v. Harris,* 172 F.3d 999, 1002-03 (7th Cir. 1999) (*citing Bell v. Wolfish,* 441 U.S. 520, 535 (1979)). "Unlike sentenced prisoners . . ., pretrial detainees, serving no sentence and being held only to answer an accusation at trial, have no expectation that, simply by virtue of their status as pretrial detainees, they will be subjected to punishment." *Rapier,* 172 F.3d at 1003. A pretrial detainee may be punished for his actions while incarcerated; however, due process requires that he receive certain procedural safeguards (advance notice of the charge at least 24 hours before the hearing and an opportunity to present witnesses and evidence to refute the charge). Such protections apply before the detainee can be subjected to treatment beyond the "normally expected incidents" of his confinement. *Id.* at 1004-05 (*citing Sandin v. Conner,* 515 U.S. 472, 484 (1995)).

"A particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose." *Rapier,* 172 F.3d at 1005. However, even if a restriction is imposed with the intent to punish, the restriction may be so minor or common to the detainee's confinement that due process does not require that the detainee be afforded advance notice. *See McGee v. Thomas,* 2007 WL 2440990, 4 (E.D. Wis. 2007) (a SVP detainee's disciplinary penalty of a reduction of his status did not require procedural due process protections because the privileges he lost were not an atypical condition of his confinement); *Ehrlich v. Mantzke,* 2002 WL 265177, 3 (N.D. Ill. 2002) (Judge Kocoras) (reduction of detainee's classification, earlier lock-up times, and restriction of other privileges were *de minimus* and did not rise to a level to require constitutional due process protections).

Plaintiff's restrictions of earlier lock-up times, shorter visitation periods, reduction in pay, and reduction of certain recreational activities were *de minimus*. (R. 1, Complaint ¶¶ 24, 33, 64; R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., pp. 40-41, 43-44.) Such impositions were not significant hardships with respect to the conditions of his confinement and are too minor to warrant constitutional due process concerns. Even if the defendants imposed these restrictions with an intent to punish, the restrictions are too minor to trigger procedural due process concerns. *See McGee*, 2007 WL 2440990 at * 4; *Ehrlich*, 2002 WL 265177 at * 3; *see also Thielman*, 282 F.3d at 484.

The only restrictions plaintiff received that may have involved procedural due process concerns appear to be his segregation for 58-60 days and possibly his room confinement for five to seven days, i.e., the restrictions imposed following the December 2001 and the June 18, 2001 BC meetings. (*See* R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., pp. 39-43, 66.) Although one court has indicated that segregation confinement for an SVPA detainee does not necessarily constitute punishment where the detainee retained certain freedoms, *McGee*, 2007 WL 2440990, this court has not decided the issue and need not decide it in this case. Even if plaintiff's segregation and room confinement imposed in June and December of 2001 constituted punishment, thus requiring constitutional procedural protections of advance notice and an opportunity to interview and call witnesses, the law defining the applicable procedural safeguards was not clearly established at the time of the BC actions. The defendants' actions with plaintiff's BC meetings were reasonable such that they are entitled to qualified immunity.

### 2. Qualified Immunity

The doctrine of qualified immunity shields public officials who perform discretionary duties from liability and protects those "who act in ways they reasonably believe to be lawful." *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) (*quoting Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). "The defense provides ample room for mistaken judgments and protects all but the plainly incompetent and those who knowingly violate the law." *Wheeler*, 539 F.3d at 639. Courts have used

a two-step approach when considering if qualified immunity applies: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Wheeler*, 539 F.3d at 639 (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also Pearson v. Callahan*, – U.S. --, 129 S. Ct. 808, 818 (2009) (the Supreme Court recently clarified that *Saucier*'s two-step approach is not mandatory and courts may address the two inquiries in either sequence).

Although qualified immunity is an affirmative defense, once a defendant raises it, the plaintiff has the burden to defeat it. *Wheeler*, 539 F.3d at 639. To overcome a qualified immunity defense, the plaintiff must demonstrate that the constitutional right was clearly established at the time of the violation. A plaintiff can show this by presenting then-existing cases that "both articulated the right at issue and applied it to a factual circumstance similar to the one at hand." *Boyd v. Owen*, 481 F.3d 520, 526-27 (7th Cir. 2007) (*quoting Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 620 (7th Cir. 2002)). The cases "must demonstrate that, at the time the defendants acted, it was certain that their conduct violated the law," and the unlawfulness of their actions must be apparent. *Boyd*, 481 F.3d at 26 (*quoting Doyle*, 305 F.3d at 620). "In the absence of precedent, a right may be clearly established where the contours of the right are sufficiently clear that reasonable persons would have understood their conduct to be unconstitutional, or where the constitutional violation is so patently obvious that widespread compliance with the law has prevented the court from reviewing it." *Boyd*, 481 F.3d at 526-27 (*citing Nanda v. Moss*, 412 F.3d 836, 844 (7th Cir. 2005)).

In this case, plaintiff does not cite to, and this court is unable to locate, a case from before the defendants' actions that applied procedural due process rights of advance notice and an opportunity to call witnesses to disciplinary actions taken against SVPA detainees. (*See* R. 141-1, Pl.'s Opposition to Defs.' Motion for Summary Judgment, pp. 10-12.) Plaintiff instead contends that the contours of his due process rights were sufficiently clear from prior case law. (*Id.*) He cites to *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982); *Seling v. Young*, 531 U.S. 250, 265 (2001); and *Wolff v.*

*McDonnell*, 418 U.S. 539, 558 (1974), to support his contention. (R. 141-1, Pl.'s Opposition to Defs.' Motion for Summary Judgment, p. 11.) In *Youngberg*, the Supreme Court held that the physical bodily restraint for several hours a day of an involuntarily committed person (a severely mentally retarded person in that case) violated due process. The court stated that civilly committed persons "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321-22. The restraint necessary for such detainees was to be determined by professional judgment. *Id.* In *Seling*, the Court upheld the constitutionality of a state statute allowing for the confinement of sexually violent persons after they served their criminal sentences. The Court determined that such confinement was civil, as opposed to punitive and thus criminal, in nature. Citing *Youngberg*, the *Seling* Court stated that the confinement of involuntarily committed sexually violent persons had to "bear some reasonable relation to the purpose for which persons are committed." *Seling*, 531 U.S. at 265. In *Wolff*, the Court held that convicted prisoners were entitled to procedural due process rights of advance notice and an opportunity to call witnesses and present evidence before a disciplinary action resulting in loss of good-time credit. *Wolff*, 418 U.S. at 564-67. Although *Youngberg* and *Seling* addressed the substantive due process rights of civilly committed persons, neither case, even when read together and in conjunction with *Wolff*, made sufficiently clear the process due a civil detainee being disciplined for his actions while committed.

At the time of the defendants' actions in plaintiff's case, courts relied on *Sandin* when addressing the constitutional implications of segregation and other restrictions for SVP detainees. *Thielman v. Leean* 282 F.3d 478, 482-83 (7th Cir. 2002); *Leamer v. Fauver*, 288 F.3d 532, 546 (3rd Cir. 2002). "Under *Sandin*, the mere fact of placement in administrative segregation is not in itself enough to implicate a liberty interest; the liberty interest only exists if that placement is an 'atypical and significant hardship' relative to others similarly sentenced." *Leamer*, 288 F.3d at 546; *see also Thielman*, 282 F.3d at 483 ("to state a procedural due process claim deriving from state law, Thielman

must identify a right to be free from restraint that imposes atypical and significant hardship in relation to the ordinary incidents of his confinement").

In 2002, Judge Kocoras issued one of the first opinions, if not the first, from this Court addressing what procedural due process rights existed for SVPA detainees. *Ehrlich v. Mantzke*, 2002 WL 265177, \*4 (N.D. Ill. Feb. 25, 2002). In *Ehrlich*, Judge Kocoras noted that, with respect to a disciplinary hearing against an SVP detainee resulting in punishment, certain procedural due process rights applied: advance written notice of the charges at least 24 hours before the hearing; the opportunity to call witnesses and present evidence; written findings by the factfinder; and a decision supported by at least some evidence. Judge Kocoras found, however, that the restrictions imposed upon Ehrlich – a reduction of his status from "responsible" to "general," greater confinement to his room, and earlier lock-up times for five days — were *de minimus* and did not invoke such procedural due process concerns. *Id.* Judge Kocoras went on to find that, even if Ehrlich's restrictions constituted punishment that triggered a procedural due process right, qualified immunity applied since the right was not clearly established. "While it was established that a pretrial detainee could not be punished without due process of law, *see, e.g., Rapier, supra,* 172 F.3d at 1003-04; *Zarnes v. Rhodes,* 64 F.3d 285, 291-92 (7th Cir.1995), it was not clearly established that the same standards applied to a person in Ehrlich's circumstances." *Ehrlich,* 2002 WL 265177 at\*4. Judge Kocoras noted that, "[a]lthough committed mentally ill persons, like pretrial detainees, retain a substantive due process right to be free from unnecessary physical restraint, the limitation on the state's right to restrain them has been defined by the bounds of acceptable professional judgment, rather than the procedural due process requirements applicable to those confined for non-therapeutic purposes. *See Youngberg,* 457 U.S. at 321-22." *Ehrlich,* 2002 WL 265177 at\*4.

Like Ehrlich, plaintiff's restrictions were for the most part *de minimus.* With respect to any restrictions that were not *de minimus* and required advance notice and the opportunity to call witnesses,

the procedural due process right was not clearly established at the time of the restriction, and the defendants are entitled to qualified immunity.

Not until June of 2003 did the Seventh Circuit address the due process rights of civilly committed sexually violent persons subjected to segregation confinement. *West v. Schwebke*, 333 F.3d 745, 747-48 (7th Cir. 2003). In *West*, sexually violent detainees were confined for periods ranging from 20 to 80 days to a type of segregation termed "therapeutic seclusion." Such confinement consisted of

placement in a cell that contain[ed] only a concrete platform (which serve[d] as a bed), a toilet, and a sink. Detainees in seclusion often were deprived of clothing and other amenities. Secluded detainees were allowed out, in shackles, one hour a day on weekdays and not at all on weekends (when staffing levels were lower). When the staff thought that secluded detainees might be ready for return to the general population, they were allowed out two hours a day, but still kept in restraints.

*West*, 333 F.3d at 747. Citing *Youngberg* and *Seling*, the Seventh Circuit found that such seclusion had to be reasonably related to the purpose of the confinement. The *West* Court further rejected a qualified immunity argument, noting that *Youngberg* and the Court's application of *Youngberg* in *Foucha v. Louisiana*, 504 U.S. 71, 79-80 (1992) [2] to "civil detainees who have committed criminal acts," made sufficiently clear that the type of confinement in *West* could be justified only on security or treatment grounds. *West*, 333 F.3d at 748-49.

Plaintiff's segregation and room confinement did not compare to the confinement in *Youngberg* (physical restraint of retarded person for several hours a day) or in *West* (seclusion in a room with only a toilet, a sink, and a concrete platform for a bed; often no clothing or other amenities; and only one

---

[2] In *Foucha*, 504 U.S. at 79-80, the Supreme Court addressed the constitutionality of continued civil commitment of persons found not guilty by reason of insanity beyond the time they were found no longer dangerous. The *Foucha* Court cited *Youngberg* for the general principle that freedom from physical restraint based upon arbitrary governmental action is the core concern of the Due Process Clause. *Foucha* and *Seling*, and their citation to *Youngberg*, may have clarified that the confinement of persons not serving a criminal sentence had to be civil in nature, as opposed to punitive. However, the contours of what rights are due for a civilly committed person facing disciplinary action are not clear from these cases. *See Ehrlich*, 2002 WL 265177 at*4 (applying qualified immunity to Behavior Committee actions similar to plaintiff's).

hour of recreation outside the room with the restraint of shackles). Plaintiff stated that his segregation involved confinement to his room for several hours a day, during which he was denied his personal property of a radio, television, typewriter, and electric razor. He had access to the dayroom for several hours each morning and each afternoon. He was given a jumpsuit to wear; he had a change of underwear, as well as sheets and linens for his bed; he had writing materials; and he was allowed visitors. He was restrained with only handcuffs when leaving his unit, and leg irons were used only for trips outside the facility. (R. 1, Complaint, ¶¶ 96-99; R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., pp. 65-69.) The conditions described by plaintiff do not approach the level of treatment in *West* or in *Youngberg*. *See McGee v. Thomas*, 2007 WL 2440990, 3 (E.D. Wis. 2007). The due process right that the *West* Court considered clearly established in light of *Youngberg* was not clearly established for the restrictions imposed upon plaintiff.

Even with respect to pretrial detainees, the Seventh Circuit in *Rapier* did not expressly determine whether placement in segregation for a rule violation while incarcerated constituted punishment. Instead, the *Rapier* Court concluded that, even if placement in segregation was punishment, the law was not clearly established at the time of the jail officers' actions and they were thus entitled to qualified immunity. *See Rapier*, 172 F.3d at 1006. The Seventh Circuit did not make clear that "[a] pretrial detainee cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less" until its decision in *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002). The Seventh Circuit did not apply *Higgs* to SVP detainees until *West* in June of 2003. *See West*, 333 F.3d at 748.

The defendants acknowledged in their Answer to the Complaint that, "beginning in 2003, residents were given advanced notice of Behavior Committee meetings." (R. 98, Defs.' Answer to Complaint, p. 3.) Providing such procedural due process protections in 2003 accords with the cases discussed above. This court cannot find that the defendants were unreasonable for not providing such

protections before then. Plaintiff has not overcome his burden of demonstrating that the defendants are not entitled to qualified immunity with respect to the BC actions in this case. Accordingly, the court denies plaintiff's motion for summary judgment, grants the defendants' motion for summary judgment for this claim, and dismisses with prejudice plaintiff's claim asserting due process violations with respect to the four BC actions taken in 2001 and 2003.

## II. MAIL

Plaintiff contends that the defendants tampered with his legal mail. Specifically, plaintiff alleges that "legal and personal mail, both incoming and outgoing, [has] been suspiciously 'lost,'" (R. 1, Complaint ¶ 13), and that "Federal Express packages sent to the Plaintiff from his lawyers containing important legal documents are signed by TDCF staff and are either undelivered or are delayed in delivery for as long as two weeks. Frequently, mail to the Federal Courts, both incoming and outgoing, is tampered with and never reaches the Courts, resulting in dismissals of cases." (*Id.* at ¶ 116.) Plaintiff states that, for a period of time, his mail was delivered to Timothy Budz's office, opened and read, and then put back into the mail system to be given to plaintiff, that Robert Glotz sometimes grabbed plaintiff's mail and held onto it for a while or returned letters, and that Douglas Collins either threw away plaintiff's letters or hid them in drawers or under filing cabinets. (R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., pp. 14-20.)

Inmates and detainees have protected First Amendment interests in both sending and receiving mail. *See Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999). With respect to legal mail, a detainee is entitled to greater protections because of the potential for interference with his right of access to the courts. *Rowe*, 196 F.3d at 782. However, to demonstrate that a right of access to the courts has been adversely affected, a detainee must demonstrate that he was prejudiced, i.e., that he had a non-frivolous legal claim that was frustrated or impeded by the defendants' mishandling of mail. *Marshall v. Knight*, 445 F.3d 965, 968-69 (7th Cir. 2006); *Lehn v.*

*Holmes*, 364 F.3d 862, 868 (7th Cir. 2004); *Ortloff v. United States*, 335 F.3d 652, 656 (7th Cir. 2003). Although detainees have a First Amendment right to send and receive mail, that right does not preclude officials from examining mail to ensure that it does not contain contraband. *Wolff v. McDonnell*, 418 U.S. 539, 576 (1974); *Rowe*, 196 F.3d at 782. Furthermore, the occasional interference with a detainee's mail does not rise to the level of a constitutional violation, and a plaintiff must demonstrate a systematic pattern or practice with interfering with the detainee's mail. *See Bruscino v. Carlson*, 654 F. Supp. 609, 618 (S.D. Ill. 1987); *see also Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000) (sporadic and short-term delays in receiving mail do not constitute a First Amendment violation).

Plaintiff alleges that numerous letters sent to his attorneys (Winston & Strawn, public defenders, appellate defenders) were tampered with, that pleadings he prepared and addressed to courts were never delivered, and that letters sent to him from attorneys and courts were never received. (R. 132-3, Defs' Rule 56.1 Statement, Pl.'s Depo. p. 15.) Plaintiff further alleges that for a period of time Budz had plaintiff's mail delivered to Budz's office, and that Budz would put plaintiff's mail back into the system to be delivered to plaintiff a day or two days later. During that time, Budz "delayed, opened it, read it," including plaintiff's legal mail. (*Id.* at 14-15.) One Federal Express package from his attorney at Winston & Strawn was tracked as delivered to the Joliet Facility, but plaintiff never received it. (*Id.* at 15.) Plaintiff specifically referred to two cases, one in the Seventh Circuit and the other in this court before Judge Andersen, where pleadings he drafted were never delivered. Plaintiff contends that both the Seventh Circuit and Judge Andersen dismissed plaintiff's cases for want of prosecution, but then reinstated them. (*Id.* at 11-12.) Allegedly, there were additional instances of lost or tampered with mail. But, plaintiff could not specifically refer to them because documents were lost during his transfer from the Joliet Facility to Rushville. Plaintiff stated that many of the documents demonstrating tampering with mail were submitted with the Seventh Circuit case. (*Id.* at 9, 12.) Plaintiff contended

that, even though the two cases he specifically referred to were reinstated, they were delayed for considerable amounts of time. (*Id.* at 14.)

Viewing the evidence in a light most favorable to plaintiff, a question of fact remains with this issue. Plaintiff specifically referred to only two cases where his pleadings to courts were not delivered and he admits that both cases were reinstated, which may not be enough to succeed on a mail-tampering claim. *See Castillo v. Cook County Mail Room Department,* 990 F.2d 304, 306 (7th Cir. 1993) (Seventh Circuit indicated that three instances of tampered-with mail over a period of nine months, though enough to withstand a motion to dismiss, would likely not establish a constitutional violation). However, plaintiff indicated that there were numerous other instances, and that grievances about these instances were in the file of the Seventh Circuit case. (*Id.* at 9, 11-12.) Also, plaintiff's description of Budz having plaintiff's mail delivered to Budz, reading the mail, and then putting it back into the system, as well as another staff member placing mail underneath cabinets and control centers, (*id.* at 13-15.), alleges a systematic pattern or practice of interference with his mail, and not simply occasional or sporadic delays. *See Bruscino,* 654 F. Supp. at 618; *see also Zimmerman,* 226 F.3d at 573. Accordingly, the court denies the defendants' summary judgment motion with respect to this claim.

## III. RETALIATION

Plaintiff alleges that the defendants retaliated against him (1) because he filed lawsuits and grievances and refused to participate in treatment programs, and (2) because he complained about not receiving dietary protein supplements in accordance with a doctor's orders. (*See* R. 1, Complaint ¶¶ 13, 84.) Plaintiff states that false disciplinary charges were levied against him, visitation and phone privileges were restricted, his mail was tampered with, and he was kept in a more aggressive area of the Joliet Facility ("the loudest, filthiest place [he had] ever been in almost 30 years of imprisonment"). (R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., pp. 54-55.) Plaintiff specifically refers to one incident when he contacted one of his attorneys because he was not able to receive dietary

supplements. Plaintiff's attorney contacted an attorney associated with the Joliet Facility and stated that a doctor had instructed that plaintiff should be taking dietary supplements. Plaintiff contends that, as a result of "going over Budz's head," the defendants falsely charged plaintiff with a rule violation and punished him with 60 days of segregation. (*Id.* at 60-61.)

To establish a claim of retaliation, a plaintiff must demonstrate that he engaged in protected activity and that the defendants retaliated against him based upon that activity. *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996); *see also McElroy v. Lopac*, 403 F.3d 855, 858-59 (7th Cir. 2005). A plaintiff must show a chronology of events from which retaliation can be inferred and show that retaliation was a motivating factor for the defendants' conduct. *Babcock*, 102 F.3d at 275. Even if a plaintiff establishes a retaliatory motive, he must also demonstrate that the complained of action would not have occurred without the retaliatory motive. Retaliation does not exist if the complained of actions would have still occurred. *Id. (citing Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 287 (1977)); *Roger Whitmore's Auto. Services, Inc. v. Lake County, Ill.*, 424 F.3d 659, 669 (7th Cir. 2005).

The summary judgment evidence shows that an issue of material fact remains with plaintiff's claim that the defendants retaliated against him because he complained about not getting protein supplements; however, he cannot establish that the defendants retaliated against him for filing suits and grievances.

## A.     Retaliation Based Upon Filing Suits and Grievances

The summary judgment evidence reveals that plaintiff makes only general assertions that the defendants retaliated against him for filing suits and grievances. Plaintiff stated in his deposition that the defendants harassed many detainees by filing disciplinary actions against them and by tampering with their phone calls and mail. (R. 132-3, Defs' Rule 56.1 Statement, Exh. C, Pl.'s Deposition, pp. 55-56.) When asked why such actions constituted retaliation, as opposed to simply harassment, plaintiff responded, "[b]ecause Mr. Budz repeatedly told me, as [he] did other people, that things would get a whole lot better if we would stop suing him so much and make him spend all of his time in court. And Glotz said things along the same line." (*Id.* at 56.) Other than plaintiff's reference to these comments,

he makes only broad assertions of retaliation. In response to defendants' summary judgment motion, plaintiff continues to state in a general manner that "[t]here is absolute proof that Plaintiff was retaliated against for being litigious." (R. 141-1, Pl.'s Opposition to Summary Judgment Motion, p. 9.)

Budz acknowledges in an affidavit that he repeatedly said over the years that "lawsuits take up a lot of [his] working time that could be spent more productively in program development areas." (R. 132-2, Defs.' Rule 56.1 Statement, Exh. B, Budz's Affidavit ¶ 5.) However, he also states that he never told plaintiff not to file grievances or that things would be better if he stopped filing lawsuits. (*Id.*) Budz's comments that detainees' suits are time-consuming may reveal a general gripe, but they do not establish retaliation, particularly since plaintiff does not connect the comments to any particular action. *See, e.g. Babcock,* 102 F.3d at 275 (correctional officer's comment that an inmate should "stop filing all that shit" may have demonstrated a sinister intent; however, a plaintiff must still show that adverse conduct was taken that would not have been absent a retaliatory intent).

Plaintiff's general assertions of retaliation for having filed suits and grievances and for not participating in treatment programs are insufficient to sustain this claim. "[W]hen confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC,* 840 F.2d 405, 410 (7th Cir. 1988); *see also Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois,* 424 F.3d 659, 669 (7th Cir. 2005). Plaintiff must do more than show that he engaged in protected activity and that he was later adversely treated. He "must present something by which a jury could connect the dots between" the protected activity and the adverse treatment to demonstrate retaliation. *Roger Whitmore's Auto. Services, Inc.,* 424 F.3d at 669. Plaintiff has not done this in this case. Accordingly, the court grants summary judgment for defendants on plaintiff's general retaliation claim.

**B.     Retaliation Based on Plaintiff's Complaining About Not Receiving Protein Supplements**

Unlike plaintiff's general allegations of retaliation for being litigious, his assertions that he was disciplined and placed in segregation for 60 days as a result of "going over Budz's head" to obtain protein supplements are sufficiently specific. Plaintiff stated in his deposition that BC members told plaintiff "that I should not have any attorneys contact Mr. Dyalin because it . . . pissed Mr. Budz off having DHS calling him about a medical issue, and that's why I was going to segregation." (R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., p. 60.)

The December 20, 2001, report states that the BC found that plaintiff falsely reported to a doctor that plaintiff had lost 30 pounds and that plaintiff falsely informed a Joliet Facility staff member that a doctor had prescribed dietary supplements for plaintiff. (R. 113, Pl.'s Summary Judgment Motion, Tab 11.) If the BC report is true, it would indicate that plaintiff was placed in segregation because he gave false information, and not because of a retaliatory motive. The defendants, however, have not presented evidence supporting the report.

Plaintiff has submitted a grievance filed shortly after being placed in segregation. Plaintiff complained that he requested to call as witnesses Security Therapy Aids Tanya Clairmont and Steve Mantzke, who were with plaintiff when he visited his doctor. (R. 141-2, Pl.'s Response to Defs.' Summary Judgment Motion, p.15.) Plaintiff stated that Clairmont and Mantzke would have stated that plaintiff had lost weight due to his Graves disease and that the doctor directed plaintiff to continue taking protein powder. Plaintiff also complained that a BC member told plaintiff at the December 2001 meeting, "if you had not got|ten] your lawyer involved, none of this would be happening," and that Budz told plaintiff that Budz had ordered that plaintiff be charged. (*Id.* at pp.15-16.) Plaintiff also submitted the deposition testimony of Tanya Clairmont, a Department of Human Services employee who escorted plaintiff for a doctor's visit. Clairmont stated that she was present when the doctor stated "something about ordering [plaintiff] a protein shake or powder thing." (R. 113, Pl.'s Summary Judgment Motion, Tab, 17, Clairmont's Depo., p. 32.) Clairmont did not speak at the BC meeting that resulted in plaintiff's segregation. However, she remembered telling the Joliet Facility staff member in charge of the BC meeting that "[t]he doctor did order it." (*Id.* at 33.)

In light of Clairmont's deposition testimony and the lack of other evidence demonstrating the BC's motives for their recommendation to place plaintiff in segregation, there is a question of material fact on this issue. Plaintiff may have been placed in segregation for having "gone over Budz's head."

The court thus denies summary judgment for the defendants on this claim. Plaintiff may proceed with his claim that the defendants disciplined him and placed him in segregation for having complained about not getting protein supplements.

## IV.    CONDITIONS IN SEGREGATION

Plaintiff alleges that he was placed in segregation for a period of 58-60 days and that the conditions therein were unconstitutional. He states that, while in segregation he did not have access to his personal property (radio, television, electric razor, typewriter, hot pot, and certain clothing); he was locked in a room for extended periods of time; he had to wear a yellow jumpsuit and handcuffs during visits; visits were limited to one hour; and, when being escorted outside the facility, he had to wear a jumpsuit, handcuffs, leg irons, and a waist chain, which embarrassed and humiliated him. (R. 1, Complaint, ¶¶ 96-99.) Plaintiff stated that his room was barren and too small to exercise, and he was not allowed to do push-ups or sit-ups in the day room. (R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., pp. 65-68.) Plaintiff stated that he was taken to the day room for several hours in the morning and several hours in the afternoon. There was a television in the day room, but it was set to the Black Entertainment Television station. (*Id.* at 68-69.)

As previously discussed, certain procedural protections may have applied in order to place plaintiff in segregation, *see West*, 333 F.3d at 748; however, the conditions in segregation did not rise to the level of unconstitutional. The Constitution does not require that detainees receive "optimal treatment." *See West*, 333 F.3d at 748. Instead, "all the Constitution requires is that punishment be avoided and medical judgment exercised." *Id.* at 749. The Constitution requires that detainees be housed under "humane conditions" and provided with "adequate food, clothing, shelter, and medical care." *Sain v. Wood*, 512 F.3d 886, 893-94 (7th Cir. 2008). The fact that "detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible

during confinement does not convert the conditions or restrictions of detention into 'punishment.'" *Bell v. Wolfish*, 441 U.S. 520, 537 (1979).

With respect to a majority of the conditions of plaintiff's segregation (confinement to small room, denial of personal items, limited access to the day room, only one station set on the television), courts have found that similar or worse conditions were not unconstitutional. *See Sain*, 512 F.3d at 894 (SVP detainee's subjection to an uncomfortable room with poor ventilation, foul odor, insects, and uncomfortable temperatures did not state a claim of an unconstitutional condition); *see also White v. Monohan*, 2008 WL 4682225, 3 (N.D.Ill. 2008) (finding that similar conditions did not rise to an unconstitutional level). With respect to plaintiff having to wear a bright colored jumpsuit, handcuffs, and other restraints during visits and outside trips, such conditions concern the Joliet Facility's day-to-day management of its detainees and "[we]re not 'atypical' and 'significant' hardships in relation to [the detainee]'s confinement." *Thielman v. Leean*, 282 F.3d 478, 484 (7th Cir. 2002) (requiring SVP detainee to wear a waist belt and handcuffs when being taken outside the facility did not invoke constitutional concerns); *Hargett v. Adams*, 2005 WL 399300, \*8 (N.D. Ill. January 14, 2005) (Judge Leinenweber) (wearing a bright colored jumpsuit was not unconstitutional given that it allows employees to more quickly identify detainees of a certain status). With respect to plaintiff's inability to exercise for 60 days, not allowing a detainee to exercise for an extended period of time can rise to the level of a constitutional violation. However, courts generally use 90 days as the duration of exercise deprivation to invoke constitutional concerns. *See Thomas v. Ramos,* 130 F.3d 754, 763-64 (7th Cir. 1997).

Viewing the evidence in a light most favorable to plaintiff, he cannot establish a constitutional violation with the conditions of his confinement while in segregation. Accordingly, the court grants summary judgment for defendants on this issue, and dismisses this claim.

## V.    FOOD

Plaintiff alleges that the quality of food at the Joliet Facility was so bad that it rose to the level of a constitutional violation. He asserts a string of complaints and states that detainees usually received

breakfast in a bag, which was never hot and which contained the same cereal for weeks. All meat was processed and was usually processed turkey. When chicken was served, it was undercooked. Milk was often spoiled. Fresh vegetables were never served, and the vegetables that were served were cooked beyond recognition into mush. In addition to being unappetizing, the food was not nutritious, i.e., low in protein, high in fat, and cooked in grease. Plaintiff takes medication for high cholesterol and triglyceride levels, which he blames on the food at the Joliet Facility. Often, detainees, including plaintiff, became ill immediately after eating the food, and staff members became nauseated from the smell. (R. 1, Complaint ¶¶ 114-15; R. 132-3, Defs' Rule 56.1 Statement, Pl.'s Depo. pp. 70-81.)

The Constitution requires the defendants to house plaintiff under humane conditions, which includes providing him with "adequate food." *Sain*, 512 F.3d at 893; *see also Antonelli v. Sheahan*, 81 F.3d 1422,1432 (7th Cir. 1996). "The state must provide an inmate with a 'healthy, habitable environment.' This includes providing nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) (citations omitted). To establish a constitutional violation, plaintiff must show both that he suffered a sufficiently serious deprivation and that the defendants acted with deliberate indifference to the condition. *Sain*, 512 F.3d at 894. He must thus establish both that the meals at the Joliet Facility denied him of "the minimal civilized measure of life's necessities," *see Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir.2006), and that the defendants were aware of and disregarded this condition. *Sain*, 512 F.3d at 894.

The summary judgment evidence reveals that a question of fact remains with this issue. Plaintiff stated in his deposition, "we were frequently served milk that was spoiled and outdated, coagulated and putrid. We were frequently served chicken that was still bloody, undercooked or basically raw." (R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl's Depo, p.70.) He stated that meat was submerged in grease, and he often became immediately ill while eating it. Vegetables "were cooked beyond recognition into mush." (*Id.*) Plaintiff often threw up from the food. (*Id.* at 72-73) He skipped about 60% of the meals served and ate tuna fish, chili, and Ramen Noodles obtained from the commissary,

which he cooked using a hotplate in his room. (*Id.* at 73-74, 83-84.) Plaintiff stated that he had dozens of conversations with Timothy Budz about the food, and that Budz would simply respond that the food was not that bad. (*Id.* at 77-79.)

Plaintiff submitted a number of grievances while he was at the Joliet Facility Plaintiff complained that he has Graves disease, required a balanced meal and fresh vegetables, and requested that he be allowed to receive food brought to him from outside the facility like other detainees. (R. 141-1, Pl.'s Response to Defs.' Summary Judgment Motion, pp.39-40.) He further complained that breakfast was always the same (a bagel and the same cereal), that lunches and dinners were so bad that staff members commented that it smelled "terrible," that detainees were continuously served turkey or turkey bi-products, and that there were no fresh vegetables. Plaintiff again asked that he be allowed to have someone bring him food from outside the facility. (*Id.* at 44-45.) In another grievance, plaintiff complained that lunches were always cold cuts or hot dogs without buns. And, in another grievance, he stated that butter was served with hamburgers as a condiment. (*Id.* at 47, 50-51.) Responding to the grievances, Joliet Facility staff members determined that plaintiff's health did not require a special diet, that he did not qualify to have food brought in, that the same cereal would not be served more than two days in a row, and that his complaints of food smelling bad were unfounded. (*Id.* at 41-42, 53-54, 59.)

Although plaintiff's grievances were not completely ignored, the summary judgment evidence shows that he regularly complained about the food, that he repeatedly asked that he be allowed for food to be brought to him from outside the facility, and that he often forewent meals served at the facility. In response to plaintiff's claim, the defendants have submitted an affidavit from Timothy Budz, the former director of the Joliet Facility. Budz avows that a registered dietician reviewed and approved the menus. (R. 132-2, Defs.' Rule 56.1 Statement, Exh. B.) The contract between Aramark and the Joliet Facility states that Aramark was to provide well balanced meals, that all food would meet USDA specifications, and that all menus were reviewed and approved by a dietician. (R. 141-1, Pl.'s Opposition to Summary Judgment Motion, Exh. A, Contract, p. 6.)

Although there is evidence as to what the quality of the food was supposed to be, the defendants provide no evidence indicating that the food served met the standards set out in Aramark's contract. The defendants do not submit any reports or affidavits from dieticians who reviewed the menus or from Aramark employees attesting to what food was served and how it was prepared.

Accordingly, viewing the evidence in a light most favorable to plaintiff, he may be able to establish that the quality of the food served at the facility was so bad that it was an unconstitutional condition. The defendants' motion for summary judgment on this issue is denied, and plaintiff may proceed with this claim.

## VI. NOISE

Plaintiff contends that the noise levels at the Joliet Facility were so loud that they rendered the condition of his confinement unconstitutional. He states that the staff took no steps to control the noise levels and even contributed to them. Specifically, he asserts that he could not hear his television at full volume with his door closed. (R. 1, Complaint ¶¶ 118.) "It was really loud during the day most of the time, but" the loudness "came and went." (R. 132-3, Defs.' Rule 56.1 Statement, Exh. C, Pl.'s Depo., p. 85.) During the day, plaintiff heard such noises as keys going into locks, metal doors slamming shut, guards yelling "hall run" every 20 to 30 minutes to indicate that detainees could enter or exit their rooms, and detainees banging dominoes on the table. (*Id.* at 86-87, 90.) At around 10:45 p.m. it quieted down. (*Id.*) At night, plaintiff sometimes heard the sounds of staff using a buffer on the floors, staff hanging up keys, and whistling from one nighttime staff person. (*Id.* at 86.)

Continuous, excessive noise may rise to the level of an unconstitutional condition of confinement. *See Sanders v. Sheahan,* 198 F.3d 626, 628 (7th Cir. 1999); *Antonelli v. Sheahan,* 81 F.3d 1422, 1433 (7th Cir. 1996). The pretrial detainee in *Antonelli* alleged that "the noise occurred every night, often all night, interrupting or preventing his sleep," which was sufficient to overcome a motion to dismiss. *Antonelli,* 81 F.3d at 1433. However, an allegation of only "a few hours of periodic loud noises that merely annoy[ed], rather than injure[d]" does not state a claim of an unconstitutional condition. *Lunsford v. Bennett,* 17 F.3d 1574, 1580 (7th Cir. 1994).

Viewing the evidence in a light most favorable to plaintiff, he cannot demonstrate that the noise levels at the Joliet Facility created an unconstitutional condition of a confinement. He acknowledges that the noise was not constant. It was "really loud" during the day, but "it came and went." During evening hours, it was excessively loud from dinnertime to lockup, but then quieted down around 10:45 p.m. (R. 132-3, Defs' Rule 56.1 Statement, Exh. C, Pl.'s Depo., p. 85.) Also, several of the noises plaintiff complained of -- detainees playing dominoes and a guard's whistling (*id.* at 86, 93-94) -- reveal that his complaints involved noises causing only an annoyance as opposed to excessive exposure to loud noises. Furthermore, many of the noises, such as keys in locks, doors closing, guards yelling "hall run" (*id.*), obviously occurred during the day and were "reasonably related to a legitimate and non-punitive government goal," and thus did not constitute an unconstitutional condition of his confinement. *Antonelli*, 81 F.3d at 1427-28.

The summary judgment evidence reveals that plaintiff cannot establish that he was exposed to continuous excessive noise levels that constituted a Due Process violation. The court grants summary judgment for the defendants on this issue and dismisses this claim with prejudice.

## CONCLUSION

For the reasons stated above, the court denies plaintiff's motion for summary judgment. The court grants in part and denies in part defendants' motion for summary judgment. Plaintiff may proceed with his claims that he was retaliated against with 58-60 days of segregation for having complained about not being able to get dietary protein supplements, that the defendants interfered with his right to receive and send mail, and that the quality of the food constituted a due process violation with his confinement. Plaintiff's other claims are dismissed with prejudice. The court will appoint counsel for plaintiff for his remaining claims. A status hearing is set for July 6, 2009, at 9:00 a.m.

ENTER:

Robert W. Gettleman
United States District Court Judge

DATE: *MAY 20, 2009*